United States v. Wells Fargo

# United States Court of Appeals
## for the Second Circuit

_____

AUGUST TERM, 2018

(Argued: April 4, 2019      Decided: November 21, 2019)

Docket No. 18-1746

_____

UNITED STATES OF AMERICA EX REL. ROBERT KRAUS AND PAUL BISHOP,
*Plaintiffs-Appellants*,

STATE OF NEW YORK, EX REL. PAUL BISHOP, EX REL ROBERT KRAUS, STATE OF
DELAWARE, EX REL PAUL BISHOP, EX REL ROBERT KRAUS, DISTRICT OF COLUMBIA,
EX REL PAUL BISHOP, EX REL ROBERT KRAUS, STATE OF FLORIDA, EX REL PAUL
BISHOP, EX REL ROBERT KRAUS, STATE OF HAWAII, EX REL PAUL BISHOP, EX REL
ROBERT KRAUS, STATE OF CALIFORNIA, EX REL PAUL BISHOP, EX REL ROBERT
KRAUS, STATE OF INDIANA, EX REL PAUL BISHOP, EX REL ROBERT KRAUS, STATE OF
ILLINOIS, EX REL PAUL BISHOP, EX REL ROBERT KRAUS, STATE OF MINNESOTA, EX
REL PAUL BISHOP, EX REL ROBERT KRAUS, STATE OF NEVADA, EX REL PAUL BISHOP,
EX REL ROBERT KRAUS, STATE OF NEW HAMPSHIRE, EX REL PAUL BISHOP, EX REL
ROBERT KRAUS, COMMONWEALTH OF MASSACHUSETTS, EX REL PAUL BISHOP, EX
REL ROBERT KRAUS, STATE OF NEW MEXICO, EX REL PAUL BISHOP, EX REL ROBERT
KRAUS, STATE OF MONTANA, EX REL PAUL BISHOP, EX REL ROBERT KRAUS, STATE
OF NORTH CAROLINA, EX REL PAUL BISHOP, EX REL ROBERT KRAUS, STATE OF NEW
JERSEY, EX REL PAUL BISHOP, EX REL ROBERT KRAUS, STATE OF OKLAHOMA, EX REL
PAUL BISHOP, EX REL ROBERT KRAUS, STATE OF RHODE ISLAND, EX REL PAUL
BISHOP, EX REL ROBERT KRAUS, STATE OF TENNESSEE, EX REL PAUL BISHOP, EX REL
ROBERT KRAUS, COMMONWEALTH OF VIRGINIA, EX REL PAUL BISHOP, EX REL
ROBERT KRAUS,
*Plaintiffs*,

—v.—

WELLS FARGO & COMPANY, WELLS FARGO BANK, N.A.,
*Defendants-Appellees*.

————————

Before: KATZMANN, *Chief Judge*, CABRANES AND CARNEY, *Circuit Judges*.

————————

Paul Bishop and Robert Kraus appeal from a judgment of the United States District Court for the Eastern District of New York (Cogan, *J.*) granting the motion to dismiss of Wells Fargo & Company and Wells Fargo Bank, N.A. Bishop and Kraus argue that the district court erred in concluding that fraudulent loan requests knowingly presented to one or more of the Federal Reserve System's twelve Federal Reserve Banks ("FRBs") are not "claims" within the meaning of the False Claims Act ("FCA"), and hence do not give rise to FCA liability. We agree in an opinion narrowly focused on the FCA. The FCA's definition of a "claim" is capacious. Although FRB personnel are not "officer[s]" or "employee[s] . . . of the United States," 31 U.S.C. § 3729(b)(2)(A)(i), the FRBs administer the Federal Reserve System's emergency lending facilities on behalf of the United States, using authority delegated by Congress and money provided by the Board of Governors of the Federal Reserve System. We conclude, therefore, that the FRBs are "agent[s] of the United States" within the meaning of § 3729(b)(2)(A)(i). We also conclude that the "money . . . requested" by defendants and other Fed borrowers is "provided" by the United States to advance a Government program or interest within the meaning of § 3729(b)(2)(A)(ii). Accordingly, we **VACATE** the judgment of the district court and **REMAND** the case for further proceedings.

————————

JAY W. EISENHOFER (James J. Sabella, Sharad A. Samy, Kyle J. McGee, Proskauer Rose LLP, New York, New York, and Tejinder Singh, Goldstein & Russell, P.C., Bethesda, Maryland, *on the*

*brief*), Proskauer Rose LLP, New York, New York, *for Plaintiffs-Appellants*.

AMY PRITCHARD WILLIAMS (Stephen G. Rinehart, *on the brief*), Troutman Sanders LLP, Charlotte, North Carolina, *for Defendants-Appellees*.

Joseph H. Hunt, Assistant Attorney General, Richard P. Donoghue, United States Attorney for the Eastern District of New York, Charles W. Scarborough, Joshua M. Salzman, *for* the United States, *Amici Curiae*.

Richard M. Ashton, Joshua P. Chadwick, Yvonne F. Mizusawa, Katherine A. Pomeroy, *for Amici Curiae* Board of Governors of the Federal Reserve System.

Meghann E. Donahue, Michele Kalstein, *for Amici Curiae* Federal Reserve Bank of New York.

Keith Goodwin, Gregory J. Ewald, *for Amici Curiae* Federal Reserve Bank of Richmond.

_____

KATZMANN, *Chief Judge*:

This case arises out of the 2008 financial crisis. This appeal—appellants' second—asks us to decide whether the False Claims Act (the "Act" or the "FCA"), 31 U.S.C. § 3729 *et seq.*, applies to persons who defraud the emergency lending facilities of the Federal Reserve System (the "Fed").

3

Paul Bishop and Robert Kraus ("relators") allege that Wells Fargo & Company and Wells Fargo Bank N.A. (jointly, "Wells Fargo") fraudulently misrepresented their financial condition to one or more of the Fed's twelve regional Federal Reserve Banks ("FRBs") so that they could obtain emergency loans at favorable interest rates for which they were not qualified. The district court (Cogan, *J.*) granted Wells Fargo's motion to dismiss, holding that knowingly presenting false or fraudulent loan applications to FRBs does not violate the FCA because (1) FRB personnel are not "officer[s], employee[s], or agent[s] of the United States" within the meaning of § 3729(b)(2)(A)(i); and (2) the United States does not "provide[] . . . the money . . . requested or demanded" by Fed borrowers within the meaning of § 3729(b)(2)(A)(ii).[1] *See United States ex rel. Kraus v. Wells Fargo & Co.* ("*Bishop IV*"), 11-cv-5457, 2018 WL 2172662, at \*2 (E.D.N.Y. May 10, 2018).[2]

Although we agree that FRB personnel are not "officer[s]" or "employee[s] . . . of the United States" within the meaning of 31 U.S.C. § 3729(b)(2)(A)(i), we

---

[1] For the full statutory text as of May 2009 *see infra* at 14.

[2] Unless otherwise noted, when quoting cases, all internal quotation marks, citations, and alterations are omitted.

conclude that loan requests presented to the FRBs under the Discount Window and Term Auction Facility are nonetheless "claims" under the FCA because the FRBs are "agents of the United States" within the meaning of § 3729(b)(2)(A)(i), and also because the "money . . . requested" by Fed borrowers is "provided" by the United States to advance a Government program or interest within the meaning of § 3729(b)(2)(A)(ii).

The FRBs are instrumentalities of the federal government and the operating arms of its central bank. *See Starr Int'l Co. v. Fed. Reserve Bank of N.Y.*, 742 F.3d 37, 40 (2d Cir. 2014). The Federal Reserve Act ("FRA") empowers the FRBs, in conjunction with the Board of Governors of the Federal Reserve System (the "Board"), to issue legal tender and to finance the Fed's activities by purchasing public and private debts. The FRA also authorizes the FRBs to administer the Fed's emergency lending facilities. Requests for loans made to these facilities are requests for loans from the United States. And as the FRBs are required to remit all their excess earnings to the United States Treasury, a borrower's failure to pay the appropriate amount of interest on a loan from an FRB injures the public fisc, not merely the FRBs' nominal shareholders.

The Fed, as it has evolved over the last century, involves a complex set of relationships that any court must be wary of unsettling. Thus, the opinion that follows is narrowly focused on the FCA and our analysis may not be relevant to questions involving the status of the FRBs in other contexts. Because we conclude that, in the context of the Fed's emergency lending facilities, the FCA applies to fraud involving the FRBs, we **VACATE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

## BACKGROUND

On *de novo* review, as stated *infra* at 12, we accept the facts as alleged in the complaint as true. From approximately June 2005 to September 2006, Kraus was employed by Wachovia Capital Markets LLC ("WCM"), a subsidiary of Wachovia Corporation ("Wachovia"), as Vice President, Controller for the Real Estate Capital Markets group, and Controller for the Corporate and Investment Bank Finance group. From about November 2002 to May 2006, Bishop was employed by World Savings, Inc. ("WSI") as a retail salesperson.

According to Kraus and Bishop, during these periods, and in the years that followed, Wachovia and WSI (which was acquired by Wells Fargo in October

2006) engaged in a "pervasive pattern of financial, regulatory and accounting fraud." Joint App'x at 27 (Compl. ¶ 3). Among other things, Wachovia and WSI, by and through their subsidiaries and affiliates, originated and "securitized" low-quality real estate loans and, to avoid financing these loans with the required amount of equity capital, cooked their books, improperly hiding certain assets in off-balance-sheet entities and classifying them as "trading assets" or "assets held for sale." *Id.* at 28 (Compl. ¶ 3).

When "cracks started to show in Wachovia's fragile financial façade," *id.* at 59, the bank turned to the Fed for help. As relevant herein, the Fed is comprised of twelve FRBs, which are separately incorporated banks dispersed geographically throughout the country, and a Board, which is based in Washington, D.C. and is an independent agency within the executive branch. *See* 12 U.S.C. §§ 241-252, 264, 341-362.[3] Through its banking subsidiary—Wachovia Bank National Association ("WBNA")—Wachovia requested billions of dollars

---

[3] The Fed also contains the Federal Open Market Committee ("FOMC"), composed of officials from the Board and the FRBs. The FOMC is authorized to direct the Fed's open market operations. *See* 12 U.S.C. § 263.

7

in loans from two of the emergency lending facilities operated by the Fed: the Discount Window and the Term Auction Facility ("TAF").

The Discount Window is a standing facility through which the Fed makes short-term loans to depository institutions. *See Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 145 n.1 (2d Cir. 2010). The terms of these loans depend on a borrower's financial condition: The FRA and related regulations promulgated by the Board authorize the FRBs to extend credit at a "primary credit rate" as a "backup source of funding to a depository institution . . . that is in generally sound financial condition," 12 C.F.R. § 201.4(a), and at a higher, "secondary credit rate" as "a backup source of funding to a depository institution that is not eligible for primary credit if, in the judgment of the Reserve Bank, such a credit extension would be consistent with a timely return to a reliance on market funding sources," *id.* at § 201.4(b).

FRBs are also authorized to extend longer-term secondary credit to depository institutions if "such credit would facilitate the orderly resolution of serious financial difficulties." *Id.* And FRBs may extend emergency credit to other persons in "unusual and exigent circumstances" if certain further

requirements are met. *See id.* at § 201.4(d). But the FRBs are not permitted to extend credit through the Discount Window to those institutions that are insolvent or to those that are borrowing for the purpose of lending to a person who is insolvent. *See id.* at § 201.4(d)(5)(i).

The TAF was a temporary facility created by the Board on December 12, 2007, to increase liquidity in financial markets at the outset of the financial crisis. The program's goal was to address the reluctance of financial institutions to borrow from the Discount Window at that time. Unlike the Discount Window, the TAF provides financial institutions with loans of up to 84 days in amounts and at rates set by auction. Only firms in a generally sound condition are eligible to participate. *See id.* at § 201.4(e); *see also* Extensions of Credit by Fed. Reserve Banks, 72 Fed. Reg. 71,202, 71,202–03 (Dec. 17, 2007).

During the second half of 2008, Wachovia borrowed substantial amounts from the TAF and the Discount Window. For example, on October 6, 2008, WBNA borrowed $29 billion from the Discount Window at the primary credit rate, then 2.25%. Two days later, on October 8, WBNA borrowed another $7 billion at 1.75%. On October 9, WBNA borrowed $15 billion from the TAF at a

9

rate of 1.39%, and on October 23 the bank won at auction a $15 billion TAF loan at a rate of 1.11%. *See* Joint App'x at 147. These loans were not enough to enable Wachovia to survive as a standalone entity, and Wachovia merged into Wells Fargo in December. Thereafter, Wells Fargo itself sought loans from the Fed, including $15 billion in January 2009 and $30 billion in February 2009. Wells Fargo borrowed these sums at an interest rate of 0.25%.

According to relators, Wachovia, WBNA, and Wells Fargo were not eligible for loans at these highly favorable interest rates. Among other things, WBNA and Wells Fargo were inadequately capitalized and in poor financial condition. The banks are alleged to have falsely certified their compliance with the material legal requirements of the Fed's programs, including that they were "not in violation of any laws or regulations in any respect which could have any adverse effect whatsoever upon the validity, performance or enforceability of any of the terms of" their lending agreements with the FRBs. *Id.* at 522 (Operating Circular No. 10 at § 9.1(b)).

In November 2011, Kraus and Bishop[4] filed the instant FCA action on behalf of the United States against Wells Fargo. Relators allege that Wells Fargo and Wachovia fraudulently requested loans from the FRBs and that, through the Fed's emergency lending facilities, "the United States provided significant funding . . . to the Defendants, amounting to at least tens of billions of dollars." Joint App'x at 137 (Compl. ¶ 241).

Defendants moved to dismiss, and on July 24, 2015 the district court issued an opinion granting that motion, holding that relators' complaint failed to allege false claims under the FCA. *See United States ex rel. Kraus v. Wells Fargo & Co.*, 117 F. Supp. 3d 215, 228 (E.D.N.Y. 2015) ("*Bishop I*"). Relators appealed, and we affirmed. *See Bishop v. Wells Fargo & Co.*, 823 F.3d 35, 39 (2d Cir. 2016) ("*Bishop II*"). Relators petitioned for certiorari and, the Supreme Court vacated our decision in *Bishop II* and remanded the case for further consideration in light of its opinion in *Universal Health Serv., Inc. v. United States ex rel. Escobar*, 136 S. Ct.

---

[4] Kraus had been a Vice President at WCM until his termination in September 2006. Bishop was a salesperson at WSI until his termination in May 2006. Each alleges that his termination was due to raising issues with his superiors about his employer's predatory or potentially illegal business practices.

11

1989 (2016). Thereafter, we vacated the district court's judgment and remanded the case "for the district court to determine, in the first instance, whether the relators have adequately alleged the materiality of the defendants' alleged misrepresentations." *See Bishop v. Wells Fargo & Co.*, 870 F.3d 104, 107 (2d Cir. 2017) ("*Bishop III*") (per curiam).

On remand, relators obtained leave to amend, and defendants once again moved to dismiss. On May 10, 2018, the district court granted that motion, holding that loan requests made to FRBs are not "claims" within the meaning of the FCA because (1) FRBs are neither part of the government, nor agents of the government, and (2) the United States does not "provide[] . . . the money . . . requested or demanded" by banks that borrow from the Fed's emergency lending facilities. *Bishop IV*, 2018 WL 2172662, at *2. Relators timely appealed.

## DISCUSSION

We review the district court's grant of defendants' Rule 12(b)(6) motion to dismiss *de novo*, "accepting all factual claims in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." *O'Donnell v. AXA Equitable Life Ins. Co.*, 887 F.3d 124, 128 (2d Cir. 2018).

12

## I. Statutory Framework

The FCA was "originally adopted following a series of sensational congressional investigations into the sale of provisions and munitions to the War Department" during the Civil War. *United States v. McNinch*, 356 U.S. 595, 599 (1958). "Testimony before the Congress [at that time] painted a sordid picture of how the United States," during a national emergency, "had been billed for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war." *Id.* The Act was passed in sum and substance "to stop this plundering of the public treasury." *Id.*

As relevant here, the FCA imposes liability on any person who either "knowingly presents . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes . . . a false record or statement material to a false or fraudulent claim," *id.* at § 3729(a)(1)(B); *see also Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 135 S. Ct. 1970, 1973 (2015).[5] The term "'claim"

---

[5] Relators bring their case under both an "implied certification" theory (to the extent that the banks fraudulently represented their eligibility for the loans

means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

(i) is presented to an officer, employee, or agent of the United States; *or*

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(b)(2)(A) (emphasis added).[6]

---

by concealing that they were not in sound financial condition) and an "express certification" theory (to the extent the banks made explicit certifications that they were in compliance with Section 9.1(b) of the Fed's Operating Circular 10). Although defendants challenged relators' ability to state a claim under these theories, the district court dismissed the case without reaching these issues. Accordingly, the adequacy of relators' pleadings in this respect is not before the Court on appeal.

[6] This definition is as-revised under the Fraud Enforcement and Recovery Act ("FERA"), Pub. L. No. 111-21, passed in May 2009 to "improve the enforcement of mortgage fraud" as well as to address frauds related to the

## II. Requests made to FRBs for loans from the Fed's emergency lending facilities are "claim[s]" within the meaning of the False Claims Act

The text of the FCA is capacious. Fraudulent claims are actionable not only when they are presented to an "officer" or "employee" of the United States, but also when they are presented either to "an agent of the United States" or to a "contractor, grantee, or other recipient" so long as (as to the contractors, grantees, or other recipients) a portion of the money is "provided" (or "reimburse[d]") by the United States and used to advance its interests. 31 U.S.C. § 3729(b)(2)(A). This language reflects a broad legislative purpose that is most faithfully effectuated by recognizing that the FCA applies, in some cases, to functional instrumentalities of the government and to agents pursuing its ends. As the Supreme Court has confirmed, "the objective of Congress was broadly to protect the funds and property of the Government from fraudulent claims,

---

Federal assistance programs implemented in the wake of the 2008 financial crisis. Although relators' allegations involve claims made before FERA went into effect, the district court found that the definitional changes were not relevant, neither party argued otherwise, and the case was decided under the current definition. To the extent defendants now raise arguments about the proper interpretation of the prior version of the statute, we need not decide if those arguments are waived because they are moot given our analysis below.

15

*regardless of the particular form, or function*, of the government instrumentality upon which such claims were made." *Rainwater v. United States*, 356 U.S. 590, 592 (1958) (emphasis added).

However, the FCA was not "designed to reach every kind of fraud practiced on the Government." *McNinch*, 356 U.S. at 599. For example, the Act does not reach frauds directed at private entities that only incidentally lead to payments with money provided by the government. *See Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008) ("Recognizing a cause of action under the FCA for fraud directed at private entities would threaten to transform the FCA into an all-purpose antifraud statute.").

The overarching question in this case, therefore, is whether a fraudulent loan request made to one of the FRBs is an effort to defraud a private entity or an effort to defraud the United States. *See id.* at 672 (explaining that "it must be shown that the conspirators intended 'to defraud the Government'"). The specific questions are whether (1) FRB personnel are "officer[s]" or "employee[s] . . . of the United States" within the meaning of § 3729(b)(2)(A)(i); (2) the FRBs, in operating the Fed's emergency lending facilities, are "agent[s] of the United

16

States" within the meaning of § 3729(b)(2)(A)(i); or (3) fraudulent loan requests knowingly presented to one or more of the FRBs are "claim[s]" under the FCA because the "money . . . requested" is "provided" by the United States within the meaning of § 3729(b)(2)(A)(ii). We address each question in turn.

**A. FRB personnel are not "officer[s]" or "employee[s] . . . of the United States" within the meaning of § 3729(b)(2)(A)(i)**

First, we conclude that FRB personnel are not "officer[s]" or "employee[s] . . . of the United States" within the meaning of § 3729(b)(2)(A)(i). The relevant question is not whether the FRBs functionally exercise governmental powers; the question instead is whether FRB personnel qualify as "officer[s]" or "employee[s]" of the United States under the FRA. *See Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 392 (1995) (recognizing Congress's power to determine which entities are to be considered governmental for various statutory purposes); *First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 626–27 (1983) ("[G]overnment instrumentalities [such as central banks]

17

established as juridical entities distinct and independent from their sovereign

should normally be treated as such.").[7]

Here, Congress has gone out of its way to formally separate the FRBs from

the government. The FRBs are not part of any executive department or agency.

*See U.S. Shipping Bd. Emergency Fleet Corp. v. W. Union Tel. Co.*, 275 U.S. 415, 425-

26 (1928) ("Instrumentalities like . . . the federal reserve banks . . . are not

departments of the Government"); *Scott v. Fed. Reserve Bank of Kan. City*, 406 F.3d

532, 536 (8th Cir. 2005). Nor do they have the authority to promulgate

regulations with the force and effect of law. *See Scott*, 406 F.3d at 536; 12 US.C. §

248(k). Instead, they are corporations, 12 U.S.C. § 341 ("a Federal reserve bank

---

[7] Courts need not engage in a functional analysis, *see, e.g.*, *Rainwater*, 356 U.S. 590; *McNinch*, 356 U.S. 595, where Congress's intent is clear on the face of the statute, *see, e.g.*, *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 492 (D.C. Cir. 2004) (examining Amtrak's enabling statute and concluding that Amtrak personnel are not officers or employees of the United States for purposes of the FCA); *United States ex rel. Adams v. Aurora Loan Servs., Inc.*, 813 F.3d 1259, 1260-61 (9th Cir. 2016) (examining the relevant statute and concluding that claims submitted to Fannie Mae and Freddie Mac are not presented to officers or employees of the United States); *cf. Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) ("[W]hen the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.").

[is] a body corporate"), that operate "under the supervision and control of a board of directors," which "shall perform the duties usually appertaining to the office of directors of banking associations." 12 U.S.C. § 301; *see also* 12 U.S.C. §§ 302–305.

This separation from general government dates to the founding of the Fed in 1913 when Congress, following other major advanced economies, *see, e.g.*, Cong. Rec. 6569 (April 29, 1935), decided to leave governance of money and credit, at least in part, in private hands, *see* H.R. Rep. No. 69 ("House Report"), at 18 (1913) (describing the Fed's structure as consisting of "a combination of public and private characteristics"); *Melcher v. Fed. Open Mkt. Comm.*, 644 F. Supp. 510, 521 (D.D.C. 1986), *aff'd*, 836 F.2d 561 (D.C. Cir. 1987) ("Ever since the birth of this nation, the regulation of the nation's monetary systems has been governed by a subtle and conscious balance of public and private elements."); *Fasano v. Fed. Reserve Bank of N.Y.*, 457 F.3d 274, 277 (3d Cir. 2006) (FRBs are formed as private corporations "[t]o aid in achieving Congress's goal of insulating them from political pressure"). As the Federal Reserve Bank of Richmond ("FRBR") and the Federal Reserve Bank of New York ("FRBNY") explain, the legislative history of

the FRA suggests that Congress intended the FRBs to "serve the interests of, but stand apart from, the sovereign." Brief of Amici Curiae Federal Reserve Bank of New York and Federal Reserve Bank of Richmond ("FRB Amici") at 9.

Although, in the intervening decades, Congress has transferred functional ownership and control of the FRBs to the Treasury and to the Board, *see, e.g.,* The Banking Act of 1935, Pub. L. No. 305 (1935)[8]; the Federal Reserve Reform Act of

---

[8] Cong. Rec. 13706 (statement of Rep. Steagall) (August 19, 1935) ("we have written into [the Banking Act of 1935] the principle that the Government, the sovereign people of the United States, shall have control of the Board that dictates the vast powers of the Federal Reserve System"); *id.* (explaining that the Act "represent[s] a great reform [and] . . . plan for the exercise of the sovereign power of the Government to control the Nation's credit and monetary policy"); Cong. Rec. 6569 (House, April 29, 1935) (statement of Rep. Hollister) (explaining that "Title II gives first to the [Board] greater control over the management of various [FRBs] than it has had in the past. It gives to the Executive somewhat greater control over the [Board] itself than the Executive has had in the past. It gives to the Board much greater powers over the operation of Federal Reserve banks and over the whole credit system of the country than the board has had in the past . . . when you take the cumulative combination of four or five different steps and read them as a whole, you will realize very clearly how much greater Executive control will be placed over the credit resources of the country").

1977, Pub. L. 95–188,[9] the Monetary Control Act of 1980, Pub. L. 96-221,[10] Congress has carefully retained the formal separation of the FRBs from the executive branch. Indeed, as amici point out, *see* FRB Amici at 10, Congress has considered the status of the FRBs on multiple occasions and decided not to convert them formally into government agencies, *see, e.g.*, Hearings Before Subcomm. No. 3 of the Comm. on Banking & Currency on H.R. 8516 & H.R. 8627, 86th Cong. 1–6 (1960) (bills' text); *id.* at 6–7 (description). Hence, we agree with defendants that fraudulent loan requests made to the FRBs do not qualify as claims under the first clause of § 3729(b)(2)(A)(i).

---

[9] The Federal Reserve Reform Act, among other things, codified the dual mandate, *see* 12 U.S.C. § 225a, and criminalized conflicts of interest at the FRBs, *see* 18 U.S.C. 208(a), subjecting FRB directors, officers, and employees to the same provisions governing the "[a]ctivities of officers and employees [of the United States] in claims against, and other matters affecting, the Government," 18 U.S.C. § 205.

[10] The Monetary Control Act, among other things, required the Board to annually reduce the FRB operating budgets in line with the amount of services the FRBs provided to member banks and governmental entities and to transfer the savings to the United States Treasury. *See* 12 U.S.C. 248a(d).

**B. FRBs extend emergency loans as "agents of the United States" within the meaning of § 3729(b)(2)(A)(i)**

The alleged fraudulent loan applications are nonetheless "claims" under the FCA if the FRBs act as "agents of the United States" under § 3729(b)(2)(A)(i) when operating the Fed's emergency lending facilities. We conclude that they do on a narrow reading where we confine ourselves only to the circumstances at hand, which require us to determine the meaning of the FCA in the context of extending emergency credit.

Agency is a legal concept that requires: (1) manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) the understanding of the parties that the principal is to be in control of the undertaking. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 522 (2d Cir. 2006).

Here, all three elements are met: the United States created the FRBs to act on its behalf in extending emergency credit to banks; the FRBs extend such credit; and the FRBs do so in compliance with the strictures enacted by Congress and the regulations promulgated by the Board, an independent agency within the executive branch. Although the Board's ability to micromanage the extension of credit by the FRBs is limited to review and oversight, this is by design and

consistent with agency principles. *See* Restatement (Third) of Agency § 2.02 (2006). The United States' overall control is undisputed. Congress can, among other things, amend the FRA to adjust or revoke the ability of the FRBs to operate the Fed's facilities. *See* 12 U.S.C. § 347b(a) (providing that "[a]ny Federal Reserve bank, under rules and regulations prescribed by the Board of Governors of the Federal Reserve System, may make advances to any member bank" on notes "secured to the satisfaction of such Federal Reserve bank"). And the Board can promulgate new rules governing the extension of credit. *See id.*; *see also* 12 C.F.R. Part 201 (establishing parameters governing FRB lending). Among other things, under the existing statutory parameters, the Board—not the FRBs—determines the interest rates that the FRBs charge on their loans. *See* 12 U.S.C. § 357 (providing that the rates are "subject to review and determination" by the Board); 12 C.F.R. § 201.4 (setting the terms governing the availability of credit). Indeed, the Lending Agreement (which allowed the Banks to borrow under the primary credit program and required the Banks to make the representations and warranties of the Fed's Operating Circular No. 10) itself states explicitly that advances to banks from FRBs must be "in accordance with the Federal Reserve

Act and regulations promulgated thereunder by the Board of Governors of the Federal Reserve System." Joint App'x at 513.

Amici contend that the FRBs are not agents of the United States because the Board does not have the right to direct FRB lending decisions. *See* FRB Amici at 13 (arguing that FRBs "perform lending operations under authority granted to them expressly by the FRA and are not agents of any Government entity"); Brief Amicus Curiae of the United States and the Federal Reserve Board in Support of Neither Party ("United States Amici") at 15 (arguing that "[t]he authority to make these loans is directly granted to the [FRBs]… and the lending activities of the [FRBs] do not take place on behalf of or under the delegated authority of the board"). Defendants advance a similar argument. *See* Brief and Supplemental Appendix for Defendants-Appellees ("Def. Br.") at 41 ("FRBs are not acting as Board delegates when operating the Programs").

We are unpersuaded for three reasons. *First*, agency law unquestionably permits a principal to delegate the power to act on its behalf to another party and to give that party some discretion. *See, e.g.*, Restatement (Third) of Agency § 2.02 (2006) ("If a principal states the agent's authority in terms that contemplate that

24

the agent will use substantial discretion to determine the particulars, it is ordinarily reasonable for the agent to believe that following usage and custom will be acceptable to the principal."); *id.* ("The principal's instructions . . . may [in some circumstances] reasonably be understood by the agent to authorize the agent to exercise discretion."). Accordingly, that the law empowers the FRBs to decide, in their judgment, when to extend emergency loans, *see generally* 12 U.S.C. § 347b(b)(4) ("A Federal Reserve bank shall have no obligation to make, increase, renew, or extend any advance or discount . . . to any depository institution."), does not mean that the FRBs are acting on their own behalf and not on behalf of the United States.

*Second*, the Board exercises substantial control over FRB emergency lending activities through its statutory authority to, among other things, "examine at its discretion the accounts, books, and affairs of each [FRB]," 12 U.S.C. § 248(a)(1); "supervise and regulate . . . the issue and retirement of Federal Reserve notes," *id.* at § 248(d); "suspend or remove any officer or director of any [FRB]," *id.* at § 248(f); require the FRBs to "writ[e] off [] doubtful or worthless assets" from their balance sheets, *id.* at § 248(g); "suspend, for the violation of

25

any of the [applicable FRA] provisions…the operations of any [FRB], to take possession thereof, [and to] administer the same," *id.* at § 248(h); "exercise general supervision" over the FRBs, *id.* at § 248(j); "delegate" certain Board functions to the FRBs, *id.* at § 248(k); levy assessments upon the FRBs to pay the Board's operational expenses, *id.* at § 243; approve the appointment of the president and chief executive officer of FRBs, *see id.* at § 341 (fifth); appoint the chair and deputy chair of the board of directors of the FRBs, *id.* at § 305; and, "in its discretion . . . suspend" any bank from using the "credit facilities of the Federal Reserve System," *id.* at § 301, *i.e.* the lending facilities at issue in this case. The Board is even empowered to refuse to provide FRBs with Federal Reserve notes, as discussed further herein. *See id.* at §§ 411-12; *id.* at § 414 (providing that the Board "shall have the right . . . to grant in whole or in part, or to reject entirely the application of any Federal Reserve bank for Federal Reserve notes").

*Third*, the FCA does not require that "agents of the United States" be agents of a United States agency. It requires merely that the FRBs act, and be empowered by law to act, on behalf of the United States. While the Board's formal authority to control FRB lending decisions may be constrained in certain

respects,[11] there is no such constraint on the United States. Indeed, the FRBs

extend emergency loans pursuant to a statutory delegation from Congress and

according to the terms set forth by Congress in the FRA. Congress may revoke

this authority at any time or change the terms of its exercise. *See Am. Bank & Tr.*

*Co. v. Fed. Reserve Bank of Atlanta*, 256 U.S. 350, 359 (1921) ("The policy of the

Federal Reserve Banks is governed by the policy of the United States with regard

to them."). Indeed, if the FRBs do not act on behalf of the United States, on whose

behalf do they act? No party contends that FRB emergency lending is done for

the profit of the FRBs' nominal shareholders—the profits on FRB loans accrue

entirely to the United States Treasury, rather than to the FRB's member banks.

*See Starr*, 742 F.3d at 40 ("[The FRBs] are not operated for the profit of

---

[11] Amici and defendants point out that we concluded in a Freedom of Information Act case that "the lending activities of the Federal Reserve Banks do not take place 'on behalf of' or under the 'delegated authority' of the Board." *Fox News Network, LLC v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 158, 161 (2d Cir. 2010). But the FRBs need not be acting on behalf of the Board to be agents *of the United States*. Nor does *Fox News* involve the concept of "agency" under the FCA. Rather, its focus is the Fed's administrative structure for document control purposes – quite a different context from that presented here.

shareholders; rather, they were created and are operated in furtherance of the national fiscal policy.").

Amici concede that the FRBs are, as they put it, "federal instrumentalities." United States Amici at 7. And they concede that FRBs are not merely standalone instrumentalities; they are part of a system created by Congress and subject to the Board's general supervisory authority. *See McKinley v. Bd. of Governors of Fed. Reserve Sys.*, 647 F.3d 331, 332 (D.C. Cir. 2011); 12 U.S.C. § 341. As amici put it, the FRBs are

> components of the Federal Reserve System [that] operate in the public interest, and, specifically, in furtherance of [the] system's functions of conducting the nation's monetary policy, promoting the stability of the financial system, promoting the soundness of individual financial institutions, fostering payment and settlement system safety, and promoting consumer protection and community development.

United States Amici at 6. Further, as amici explain, "[o]ne [of the] function[s of the FRBs] . . . is to serve as backup lenders for banks and other depository institutions in their regions." *Id.* at 7; FRB Amici at 5 ("The [FRBs] are federal instrumentalities—corporations chartered pursuant to the FRA to perform the central bank's operational responsibilities."); *id.* at 7 ("Congress established Federal Reserve Banks for public purposes to be the operating arm of the nation's

28

central bank, in accordance with the statutory mission set out in the FRA."); *see also Starr*, 742 F.3d at 40; *Fasano*, 457 F.3d at 281 n.6 (collecting cases).

Moreover, given the purpose of the FCA, we see no reason to depart from the plain meaning of the phrase "agent of the United States" here. One need only put the instant allegations into context to see why. As discussed further herein, this case involves the creation and lending of tens of billions of dollars. In the best of times, few if any entities can borrow such sums even with advance notice and planning. Yet defendants were able to secure these amounts on short notice during a period when private financing markets were all-but-frozen. Defendants' alleged underpayment of interest reduced FRB earnings, which dollar for dollar reduced the sums the FRBs transferred to the Treasury. Fraud during a national emergency against entities established by the government to address that emergency by lending or spending billions of dollars is precisely the sort of fraud that Congress meant to deter when it enacted the FCA.

Our conclusion that the FRBs act as "agents of the United States" within the meaning of the FCA when extending emergency credit, does not bear on the question of whether the FRBs may or may not be agents in other contexts, nor do

we conclude that the FRBs are agents within the FCA in any other context. We

hold only that, in this limited context, the FRBs qualify as "agents of the United

States" within the meaning of § 3729(b)(2)(A)(i) of the FCA.[12]

### C. The United States "provides" the money requested by borrowers seeking loans from the Fed's emergency lending facilities within the meaning of § 3729(b)(2)(A)(ii)

We also conclude that the alleged fraudulent loan applications are

"claims" under the FCA because the United States "provides" the money

---

[12] We see no tension between our conclusion that the FRBs act as agents of the United States when extending emergency loans and the fact that the FRA expressly designates the FRBs as "fiscal agents" with respect to certain matters (that do not include extending emergency loans). *See* 12 U.S.C. §§ 391-395. Congress specified the fiscal agency relationship for the purpose of putting the FRBs under the direction of the Treasury Department in certain limited circumstances, not to preclude an agency relationship between the United States and the FRBs in other contexts. *See, e.g.*, 12 U.S.C. § 391 (instructing the FRBs to take various actions "upon the direction of the Secretary of the Treasury" and stating that "when required by the Secretary of the Treasury, [the FRBs] shall act as fiscal agents of the United States"). The text of the FCA does not require that claims be submitted to agents of the Treasury Department; it refers instead to "agents of the United States." Nor does our conclusion that the FRBs are "agents of the United States" within the meaning of subsection (ii) make them "agencies" of the United States, as defendants seem to suggest. *See* Def. Br. at 41. Our holding is limited to the False Claims Act and to the circumstances presented in this case.

"requested" by borrowers from the Fed's emergency lending facilities within the meaning of § 3729(b)(2)(A)(ii) and the money requested is to be spent to advance a Government program or interest.

Subsection (ii) defines "claim," even more broadly than subsection (i), to encompass demands or requests made to a "contractor, grantee, or other recipient," if two conditions apply: first, "if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest," and second, if the United States Government "provides or has provided any portion of the money or property requested or demanded," or "will reimburse [the recipient of the demand] for any portion of the money or property which is requested or demanded. . . ." 31 U.S.C. § 3729(b)(2)(A)(ii)(I)(ii). Amici argue that the Fed's emergency lending facilities do not qualify as money requested or demanded by the U.S. because the FRBs are not funded by the United States Treasury. Defendants make a similar point. *See* Brief and Supplemental Appendix for Defendants-Appellees ("Def. Br.") at 29 ("Courts have consistently looked to the involvement of government funds in determining whether a claim has been made."); *id.* at 51 ("No U.S. Treasury funds were used

31

to supply any part of the Advances nor were the FRBs reimbursed for Advances by the U.S. Treasury."); *see also id.* at 49 ("The Advances are also not claims because they are not made with or reimbursed by U.S. Treasury funds.").

But the FCA nowhere limits liability to requests involving "Treasury Funds." FRB Amici at 14. The text of the FCA is deliberately broad, including "any request or demand . . . for money or property . . . *whether or not* the United States has title to the money or property," as long as "the United States Government . . . provides or has provided any portion of the money or property requested or demanded." 31 U.S.C. § 3729(b)(2)(A) (emphasis added). The statute makes no mention of the Treasury Department. Indeed, as the United States and the Board concede, the word "'provides' is properly read to reach some circumstances in which the government makes money available through an exercise" of its legal authority outside the appropriations process. United States Amici at 18; *United States ex rel. Heath v. Wisconsin Bell, Inc.*, 111 F. Supp. 3d 923, 926 (E.D. Wis. 2015) ("The fact that [Universal Service] Fund money does not pass through the Treasury does not make the government any less its source.").

32

This is such a circumstance. Just as individuals and businesses maintain bank accounts at banks like Wachovia and Wells Fargo, banks like Wachovia and Wells Fargo maintain bank accounts at the FRBs. The balances in these accounts are called "reserves."[13] Banks like Wachovia and Wells Fargo are required by Congress and by the Board to maintain certain minimum amounts of reserves in their accounts. *See* 12 U.S.C. § 461 (establishing "reserve requirements"). Reserve requirements may also be satisfied with cash (*i.e.*, Federal Reserve notes), which is functionally equivalent to reserve balances; reserve balances and cash are the two components of "base money" (also called the monetary base).[14] Both types of base money are *liabilities,* not assets, of the FRBs. (For ordinary private-sector

---

[13] While paper currency may be held by anyone, reserve balances may be maintained only by banks and governmental entities. *See, e.g.,* 12 U.S.C. § 342 (authorizing FRBs to maintain accounts for member banks, other depository institutions, and the U.S. Treasury Department); *id.* at § 391 (authorizing FRBs to maintain accounts for government-sponsored enterprises in the residential mortgage business); *id.* at §§ 1435, 1452(d), 1723a(g) (authorizing FRBs to maintain accounts for foreign governments, foreign banks, and central banks); *id.* at §§ 347d & 358 (authorizing FRBs to maintain accounts for the International Monetary Fund and the World Bank).

[14] *See* Board of Governors of the Federal Reserve System, Aggregate Reserves of Depository Institutions and the Monetary Base - H.3, Table 2, available at https://www.federalreserve.gov/releases/h3/current.

banks, base money can only be an asset not a liability.) In other words, the FRBs are the issuers of base money. They do not lend out preexisting funds; they create "funds" in the most elemental sense. They perform this function on behalf of the United States, as federal instrumentalities. When banks request loans from the FRBs, the FRBs extend those loans by increasing these reserves. As FRB Amici explain:

> When the Fed makes a $100 million loan to [a bank], the bank is credited with $100 million of reserves . . . No preexisting "source" of funds exists. Crediting the loan amount to the borrowing bank's reserve account creates new reserves, increasing the overall level of reserves in the banking system by exactly the amount lent.

FRB Amici at 15-16; *see also* United States Amici at 16. [15] These new reserves are created *ex nihilo*, at a keystroke. They are promises by the FRBs to pay Federal Reserve notes (dollar bills) to the banks on demand.[16] *See* FRB Amici at 16.

---

[15] Although banks and other depository institutions can also create money in the form of deposits, only the Fed can issue legal tender. Banks must always stand ready to redeem their deposit credits in Federal Reserve notes. The Fed faces no such constraint. *See* Joseph H. Sommer, *Where is a Bank Account?*, 57 MD. L. REV. 1, 13 (1998) ("[r]edemption of currency can only compel more currency"); Morgan Ricks, *Money as Infrastructure*, 3 COLUMB. BUS. L. REV. 757, 775 (2018).

[16] Accordingly, reserves appear as liabilities on the FRBs' balance sheets.

The FRBs' promises to pay notes serve as money or legal tender because they must be accepted by the Treasury and by other banks as payment. As the United States explains, "the United States vested the Reserve Banks with the authority to make the loans at issue and to credit the Reserve Bank accounts of borrowing institutions, thereby increasing the overall money supply." United States Amici at 17. Our Constitution bestows this power on Congress. *See* U.S. Const. art. I, § 8, cl. 5 ("The Congress shall have Power . . . To coin Money, regulate the Value thereof . . ."); *see also Knox v. Lee*, 79 U.S. 457, 565-66 (1871) (explaining that it "is undoubtedly the public law of this country" that Congress determines the standard of money and what instruments may pass as legal tender).[17] Had Congress not delegated this power to the Fed, the FRBs would be

*See* FRB Amici at 16 ("For example, when a Federal Reserve Bank extends credit through the Discount Window, the Federal Reserve Bank records an asset — a loan — in the amount of the loan (which equals the amount of reserves created), and a corresponding liability — the reserves credited to the borrowing bank's reserve account.").

[17] *Knox v. Lee* traces the state's prerogative back to *The Case of Mixed Money*, Davies Rep. 48 (1605), *reprinted in* 2 Cobbett's State Trials 113, 118 (1809) ("the king by his prerogative may make money of what matter and form he pleaseth, and establish the standard of it, so may he change his money in substance and

unable to extend the loans at issue in this case. And we see no reason why

Congress's decision to separate the FRBs from the Board and the Board from the

Treasury Department should alter our conclusion that the United States is the

source of the purchasing power conferred on the banks when they borrow from

the Fed's emergency lending facilities.

The loans in this case are also money provided by the United States in a

further sense. The Board puts Federal reserve notes into circulation by supplying

them to the FRBs, which are the actual direct issuers. *See* 12 U.S.C. §§ 411-12.[18]

---

impression, and enhance or debase the value of it, or entirely decry and annul it"); *id.* at 116("no other person" may make money "without special license or commandment of the king").

[18] Federal law recognizes two types of legal tender in the United States: "United States coins" and "Federal reserve notes." 31 U.S.C. § 5103; *see also* 12 U.S.C. § 411. The Treasury Department physically creates both. *See* 31 U.S.C. § 304; *id.* at § 5114; *id.* at § 303, 12 U.S.C. § 418. However, while the Treasury Department determines the supply of United States coins, 31 U.S.C. § 5111(a)(1) ("The Secretary of the Treasury . . . shall mint and issue coins. . . in amounts the Secretary decides are necessary to meet the needs of the United States"), the Board controls the supply of notes, 12 U.S.C. § 411 ("Federal reserve notes, to be issued at the discretion of the Board . . . are hereby authorized"); *id.* at § 419. The Fed puts these notes into circulation by providing them to the FRBs which ultimately exchange them for financial assets held by the private sector. For example, the FRBs promise to pay notes to private banks in order to purchase from them debt securities of the United States issued by the Treasury

Thus, when banks like Wachovia and Wells Fargo withdraw the proceeds of loans requested from (and extended by) the FRBs, the banks quite literally receive money "provided" by the Board, *i.e.* money made available and/or supplied by the United States. *See Provide*, MERRIAM-WEBSTER (11th ed. 2003) (defining "provide" as "to supply or make available"). The Board, like the U.S. Mint, is an agency of the United States. That the Board, unlike the Mint, is not also a bureau of the Treasury Department is of no legal significance here.

The Board's argument that the FCA does not apply in the circumstances presented here because the government does not exercise "substantial control over the collection and disbursement of the funds [involved]" (*i.e.*, because the FRBs determine whether to exercise the lending authority in any specific case), is unpersuasive. United States Amici at 18. The FCA statutory text covers not only money that the government specifically allocates, but also money "reimburse[d]" to the government when "requested or demanded" from the recipient. 31 U.S.C.

---

Department. These private banks then withdraw notes when they need physical currency. And, as relevant here, the FRBs are authorized to lend these notes to private banks when certain further requirements are met. *See id.* at §§ 341 *et seq.*

§ 3729(b)(2)(A)(ii)(II). By definition, a reimbursement procedure gives control (at least to some extent) to the recipient rather than the government.

Further, we are not moved, as the district court was, by the fact that private banks serve as the FRBs' nominal shareholders. *See* 12 U.S.C. § 282; Joint App'x at 1179-80. Today, the United States, not the nominal shareholders, are the economic owners of the FRBs. Among other things, Congress has provided that the net earnings of the FRBs be "recorded as revenue by the Department of the Treasury," FRB Amici at 17, and the FRBs are required to remit all their excess earnings to the United States Treasury, *see id.* at 18 ("Between 2007 and 2011— when the loans here were extended—the Board of Governors required Federal Reserve Banks to transfer excess earnings to the United States Treasury.").[19] Thus, the "capital" contributions made by member banks function as debt interests owned by the member banks, not equity interests. *See* FRB Amici at 8 ("Commercial banks acquire Federal Reserve Bank stock not for ownership or control, but because it is a condition of membership in the Federal Reserve

---

[19] Congress codified this requirement in 2015. *See* 12 U.S.C. § 289(a)(3)(B).

System. *See* 12 U.S.C §§ 282, 321."); *id.* ("The stockholders of Federal Reserve Banks receive semiannual, statutorily capped dividends on their holdings, *see* 12 U.S.C. § 289, but do not possess a residual equity interest in Federal Reserve Banks' assets, *see* 12 U.S.C. § 290"); Jesse H. Choper, John C. Coffee, Jr., & Ronald J. Gilson, CASES AND MATERIALS ON CORPORATIONS 33 (1995) ("[Shareholders] are the 'residual claimants,' who bring to the firm their special ability at risk-bearing.").[20] And, as the United States explains, "in the event that a[n] [FRB] is liquidated, any value remaining (after debts are paid and certain required payments are made) . . . become[s] the property of the United States." United States Amici at 6 (citing 12 U.S.C. § 290). Accordingly, a bank's failure to pay the applicable amount of interest on a loan from an FRB injures the public fisc, not

---

[20] Member banks also lack most of the control rights associated with ownership. Although member banks are authorized to vote for six of each Reserve Bank's nine directors (the Class A and B directors), 12 U.S.C. § 304, they are permitted to serve only as Class A directors, *id.* § 303, Class B directors must "represent the public" not the member banks, *id* § 302, and the Board of Governors alone is empowered to appoint the chair and deputy chair of the FRB boards. Further, the chair and deputy chair must be Board-appointed Class C directors, and only Class B and C directors—with the approval of the Board—are permitted to select FRB Presidents.

the FRBs' nominal shareholders; money created for the Term Auction Facility or the Discount Window is as much a product of the "public fisc" as money that is distributed by the Treasury Department.[21]

We are similarly unpersuaded by defendants' argument, seconded by amici, that 12 U.S.C. § 244 forecloses FCA liability. Section 244 provides that "funds derived" by the Board through assessments on the FRBs "shall not be construed to be Government funds or appropriated moneys." 12 U.S.C. § 244. But this provision governs the Board, not the FRBs—it states that the Board's funding (*i.e.*, for its budget and expenses), which it receives from the FRBs, shall not be treated as appropriated money. It says nothing about the FCA at all, let alone whether the government "provides" within the meaning of the FCA the money requested or demanded by borrowers from the Fed's emergency lending facilities. Moreover, section 244 is plainly concerned with insulating the Board from statutory restrictions governing appropriations, not from insulating those

---

[21] Defendants contend that **"**[c]ourts applying the FCA have consistently required . . . economic loss to . . . the United States for a claim to exist." Def. Br. at 49. As explained above, accepting the complaint's allegations as true, the economic loss to the United States here is apparent.

who defraud the FRBs from the remedies imposed by the FCA. *See id.* (providing that the Board's "expenses shall be governed solely by the provisions of this Act, specific amendments thereof, and rules and regulations of the Board not inconsistent therewith").

Nor is it clear why Congress would wish to exclude the FRBs from the protections of the FCA. It seems highly implausible that Congress would intend the FCA to cover claims made to private contractors where the money is "to advance a Government program or interest" and where the government provides or reimburses the money, but not to cover claims made to governmental instrumentalities operating under direct supervision of a government agency where the disbursement itself is part of a government program and where the money is created *ex nihilo* pursuant to congressional authority. Relators allege, *inter alia*, that "Wachovia . . . committed fraud against the United States to secure critical lifelines to keep it afloat, materially and overtly lying to [the FRBs] just to save its skin from an imminent insolvency that was brought about by its own criminal recklessness." Joint App'x at 59 (Compl. ¶ 69). If true, the FCA is able to remedy this fraud. Accordingly, we disagree with

41

the district court that fraudulent loan requests made to the FRBs do not qualify

as claims under § 3729(b)(2)(A)(ii)(I).[22]

CONCLUSION

"Few issues in the history of this nation have been as thoroughly

considered and debated as central banking and the regulation of the money

supply." *Melcher*, 644 F. Supp. at 524. "The current system . . . represents an

exquisitely balanced approach to an extremely difficult problem." *Id.* Our

decision today considers that balance only in the narrow context of the FCA and

our analysis may not be relevant to questions involving the status of the FRBs in

---

[22] The district court concluded that relators' case could not proceed under subsection (ii) because "Relators would have to allege that the Government either provided [a] portion of the money loaned to defendants, or reimbursed FRBs for making the loans." According to the district court, "[t]hey can do neither." *Bishop IV*, 2018 WL 2172662, at *9. Defendants reiterate this point on appeal. Def. Br. at 51 ("Appellants never allege in the Complaint, nor do they argue in their Brief, that Government money was used to fund the Advances or to fund FRBs generally."). But relators *do* allege that the government provided the money. *See* Joint App'x at 137 (Compl. ¶ 241) ("the United States provided significant funding…to the Defendants, amounting to at least tens of billions of dollars"); *see also id.* at 26 (Compl. ¶ 1) (alleging that defendants perpetrated [fraud] "on…the [FRBNY], the [FRBR] and/or one or more other [FRBs]. . . agencies of the United States, agents, fiscal agents and/or depositories of the United States and recipients of monies spent on the United States' behalf and to advance U.S. government . . . programs or interests").

other contexts. Because we conclude that, for the reasons stated above, in the context of the Fed's emergency lending facilities the FCA applies to this alleged fraud involving the FRBs, the judgment of the district court is **VACATED**, and the case is **REMANDED** for further proceedings consistent with this opinion.