# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 22, 2004   Decided January 11, 2005

No. 04-5051

UNITED STATES OF AMERICA *EX REL*. ALVA BETTIS,
APPELLANT

v.

ODEBRECHT CONTRACTORS OF CALIFORNIA, INC., ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 99cv02879)

———

*Herbert V. McKnight, Jr.* argued the cause for appellant. With him on the briefs was *Altomease R. Kennedy*.

*Howard S. Scher*, Attorney, U.S. Department of Justice, argued the cause for *amicus curiae* the United States of America in support of appellant in part. With him on the brief were *Peter D. Keisler*, Assistant Attorney General, *Kenneth L. Wainstein*, U.S. Attorney, and *Douglas N. Letter*, Counsel.

*Samuel J. Waldon* argued the cause for appellees. With him on the brief was *Ryan E. Bull. David A. Super* entered an appearance.

Before: EDWARDS, SENTELLE, and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* EDWARDS.

EDWARDS, *Circuit Judge*: Under the *qui tam* provisions of the False Claims Act ("FCA" or "Act"), 31 U.S.C. §§ 3729-3733 (2000), any person may initiate a lawsuit in the name of the United States for substantive violations of the Act. The United States, through its relator Alva Bettis ("Bettis"), brought this action in the District Court against Odebrecht Contractors of California, Inc., *et al*. ("Odebrecht"), alleging that Odebrecht submitted false claims to the Government in connection with a public works construction contract it had with the U.S. Army Corps of Engineers ("Corps").

In advancing his claim, Bettis relies on the fraud-in-the-inducement theory of liability under the FCA. Under that theory, every claim submitted under a fraudulently induced contract constitutes a "false claim" within the meaning of the Act (*i.e.*, is automatically tainted), even without proof that the claims were fraudulent in themselves. Bettis argues that Odebrecht fraudulently induced the Corps to award it the disputed contract by submitting an intentionally undervalued bid and making other false representations in order to win the contract, with the intention of subsequently obtaining upward modifications to the contract price.

The District Court granted summary judgment for Odebrecht, relying on two alternative grounds. First, the court rejected Bettis's fraud-in-the-inducement claim as a matter of law. The court held that, where it is alleged that the defendant has submitted a fraudulently deflated bid in order to obtain a contract, a FCA action cannot succeed without proof that one or more requests for payment under the contract were fraudulent in themselves. The United States, as *amicus curiae*, contests the District Court's legal analysis on this point, arguing that the

fraud-in-the-inducement theory of FCA liability properly applies to allegations of fraudulently deflated bids. In the alternative, the District Court concluded that, as a matter of fact, the evidence presented by Bettis was insufficient to permit the inference that Odebrecht fraudulently induced the Corps to award it the contract.

We conclude that the evidence presented by Bettis would not permit a reasonable jury to conclude that Odebrecht fraudulently induced the Government to award it the contract. We therefore affirm the judgment of the District Court on this ground alone.

## I. BACKGROUND

On March 1, 1993, the U.S. Army Corps of Engineers ("Corps") solicited bids for construction of the Seven Oaks Dam and Appurtenances in San Bernardino County, California. In preparing the solicitation, the Corps divided the construction into 150 separate tasks, referred to as bid items, and estimated the quantity of each bid item that would be required during construction. Contractors prepared a unit price for each bid item that included any indirect costs (*e.g.*, labor, equipment, overhead) and a profit margin. The final price for each bid was calculated by multiplying the bidder's unit price for each bid item by the Corps' quantity estimate and then summing the totals of all of the bid items. The final bid price was only an estimate, because the winning bidder was to be paid based on the actual quantities required during construction, not the Corps' estimated quantities. Bidders were, however, bound by their unit prices and assumed the risk if these prices turned out to be too low.

Odebrecht submitted a bid of $167,777,000. The sealed bids were opened on July 7, 1993, and Odebrecht's bid was the lowest, coming in about $29 million below the second lowest bid, which had been submitted by a joint venture involving

Tutor-Saliba Corporation and others ("Tutor-Saliba"), and almost $36 million below the Corps' cost estimate (without profit) of $203,771,540.

Tutor-Saliba commenced a series of bid protests seeking to prevent Odebrecht from being awarded the contract. On March 29, 1994, following the resolution of the bid protests, Odebrecht was awarded the contract. The Corps issued Odebrecht a notice to proceed with construction on April 20, 1994, and Odebrecht began construction shortly thereafter.

During the course of construction, Odebrecht requested and received a number of "equitable adjustments" to the contract price. Equitable adjustments are used to keep a contractor whole when the Government modifies the contract or, under some Government contracts, for changed circumstances. *See* 48 C.F.R. §§ 52.243-4, 52.243-5 (2003). They are not available for reasons unrelated to a change, such as to compensate a contractor who has underestimated his bid or encountered unanticipated expenses or inefficiencies. *Pac. Architects & Eng'rs Inc. v. United States*, 491 F.2d 734, 739 (Ct. Cl. 1974). Ultimately, by August 31, 2003, the Government had paid Odebrecht nearly $268 million, an amount that exceeded the bid price by more than $100 million. Even so, Odebrecht maintains that it sustained a loss in excess of $30 million on the project.

It is undisputed that the Corps was satisfied with Odebrecht's work on the project. Indeed, in 1999, the Corps awarded Odebrecht its Civil Works Construction Contractor of the Year award for Odebrecht's "exceptional performance" on the project.

In 1999, relator Alva Bettis, who had been employed as a project scheduler by a consulting firm retained by the Corps to monitor the dam's progress, commenced this action in the District Court, alleging that Odebrecht violated the FCA. The complaint was filed under seal and in the name of the United

States, pursuant to the *qui tam* provisions of the FCA. *See* 31 U.S.C. § 3730(b). After the Government declined to exercise its right to intervene and proceed with the action under § 3730(b), the complaint was unsealed and served.

In June 2002, Bettis filed his Third Amended Complaint, which included seven counts in which he claimed that Odebrecht violated the FCA. In Count I (the only count relevant to this appeal), Bettis pressed a fraud-in-the-inducement claim, alleging that Odebrecht fraudulently induced the Corps to award it the contract. Specifically, Bettis alleged that Odebrecht violated the Act by submitting an intentionally low bid – at which price Odebrecht knew or should have known that it could not have completed the project – with the intention of seeking adjustments to the price after winning the contract. On October 24, 2002, the District Court issued an order dismissing the count without prejudice. *See United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, Civ. A. No. 99-2879, slip op. at 4-13 (D.D.C. Oct. 24, 2002) ("Mem. Op."), *reprinted in* Joint Appendix ("J.A.") at 39, 42-51. The court explained that the count failed to state a claim, because Bettis failed to allege that Odebrecht "submitted any claim for payment in excess of its bid price," and because a "relator cannot hold [a] defendant liable under the FCA merely for obtaining the contract based on an intentionally undervalued bid." *See id.* at 12, J.A. at 50.

Bettis thereafter filed a Fourth Amended Complaint in which he amended and re-alleged Count I. The amended complaint alleged that Odebrecht violated the Act by submitting an intentionally undervalued bid in order to win the contract with the intention of seeking false modifications to the price, and then submitting false modifications. Upon completion of discovery, Odebrecht moved for summary judgment on all counts, and Bettis moved for summary judgment on Count I.

The District Court granted summary judgment for Odebrecht on all counts. *See United States ex rel. Bettis v.*

*Odebrecht Contractors of Cal., Inc.*, 297 F. Supp. 2d 272 (D.D.C. 2004). Regarding Bettis's fraud-in-the-inducement claim, the court first held, consistent with its earlier memorandum opinion, that Bettis's claim failed as a matter of law, because his claim rested on "the flawed legal argument that he can prevail on a mere showing that [1] [Odebrecht] fraudulently induced [the Corps] to enter into the contract by submitting a low bid intending to seek additional monies, and [2] that [Odebrecht] obtained monies above and beyond the contract price." *Id.* at 280-81. According to the court, as to the second element, "there must be a claim for money to which the contractor is not *legitimately* entitled" – in other words, a showing that the actual claims submitted under the contract were themselves fraudulent. *Id.* at 281 (internal quotation marks and alterations omitted). Alternatively, the District Court held that, even under Bettis's legal theory, his claim failed as a factual matter because "the facts upon which [Bettis] relies do not permit an inference that [Odebrecht] fraudulently induced [the Corps] to sign the contract by submitting a bid that it knew or should have known was false, intending to seek subsequent adjustments." *Id.* at 283. Finally, the District Court concluded that the evidence did not permit an inference that any of the requests for adjustments submitted by Odrebrecht were themselves false or fraudulent. *See id.* at 283, 290-95. This appeal followed.

Bettis challenges the District Court's resolution of his fraud-in-the-inducement claim. Bettis does not challenge the District Court's judgment with respect to any counts other than Count I, or with respect to the District Court's conclusion that none of the requests for adjustments submitted by Odebrecht could be found fraudulent in themselves. The United States appeared as *amicus curiae* for the sole purpose of contesting the District Court's articulation of the legal standard for establishing a fraud-in-the-inducement claim in the context of an allegedly fraudulent low bid.

## II. ANALYSIS

### A. *Standard of Review*

We review *de novo* a district court's decision to grant summary judgment, viewing the evidence in the light most favorable to the non-moving party. *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004). A party is entitled to summary judgment only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law. *Id.* at 966. Put another way, a party is entitled to summary judgment only if no reasonable jury could return a verdict for the non-moving party. *Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1077 (D.C. Cir. 1999).

### B. *The False Claims Act and Fraud-in-the-Inducement Liability Thereunder*

The False Claims Act was originally enacted in 1863 to protect the United States Government from financial loss resulting from fraud. The Act establishes liability for any person who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval; [or] (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government[.]

31 U.S.C. § 3729(a). The Act imposes two types of liability. "First, the submitter of a 'false claim' or 'statement' is liable for a civil penalty, regardless of whether the submission of the claim actually causes the government any damages; even if the claim is rejected, its very submission is a basis for liability. Second, the submitter of the claim is liable for damages that the government sustains because of the submission of the false claim." *United States ex rel. Schwedt v. Planning Research*

*Corp.*, 59 F.3d 196, 199 (D.C. Cir. 1995). The term "claim" is broadly defined to include "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c).

Although the focus of the FCA is on false "claims," courts have employed a "fraud-in-the-inducement" theory to establish liability under the Act for each claim submitted to the Government under a contract which was procured by fraud, even in the absence of evidence that the claims were fraudulent in themselves. *See generally United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 787-88 (4th Cir. 1999) (surveying the case law on fraud-in-the-inducement FCA liability). The most prominent of these cases is *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), in which several electrical contractors were held liable under the Act for claims submitted under a government contract obtained through collusive bidding. The Court found that each claim was actionable under the Act, even without proof that the claims themselves were false:

> This fraud did not spend itself with the execution of the contract. Its taint entered into every swollen estimate which was the basic cause for payment of every dollar paid by the [government] . . . . The initial fraudulent action and every step thereafter taken pressed ever to the ultimate goal – payment of government money to persons who had caused it to be defrauded.

*Id.* at 543-44.

When Congress amended the FCA in 1986, its legislative history recognized fraud-in-the-inducement liability under the Act. Specifically, Congress noted that, under FCA case law, "each and every claim submitted under a contract, loan

guarantee, or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim." S. REP. NO. 99-345, at 9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274.

In this case, the District Court acknowledged that, "[i]f construed broadly," the fraud-in-the-inducement theory of liability could support Bettis's claim. Mem. Op. at 10, J.A. at 48. In this respect, the court noted that the complaint alleged that Odebrecht made a false statement by submitting a fraudulently low bid, which induced the Corps to enter into the contract under which it was obligated to pay the claims that Odebrecht eventually submitted. However, the District Court refused to "extend" the fraud-in-the-inducement theory in this way. While concluding that, under *Hess*, claims submitted under a contract obtained after a fraudulently *inflated* bid are actionable even though the claims are neither false nor fraudulent in themselves, the court held that, where it is alleged that the defendant has submitted a fraudulently *deflated* bid, it must be shown not only that the low bid was fraudulent but also that one or more requests for payment under the contract induced by the low bid were themselves fraudulent. *See Bettis*, 297 F. Supp. 2d at 279-83; Mem. Op. at 11-12, J.A. at 49-50. The District Court reasoned that "it would be nonsensical and illogical" and "contrary to . . . the FCA's goal of protecting the public fisc to punish a defendant for submitting a low bid even if the defendant knows or should have known that he cannot perform at that price." *Bettis*, 297 F. Supp. 2d at 280-81 (citing Mem. Op. at 11-12, J.A. at 49-50). Unless the defendant actually seeks false modifications to the bid price, the District Court concluded, the Government "would actually benefit" from the fraudulent low bid. Mem. Op. at 12, J.A. at 50 (emphasis omitted).

The United States, as *amicus curiae*, challenges the District Court's analysis. The Government argues that there is no basis in the text of the FCA for distinguishing between a fraudulently inflated bid and a fraudulently deflated one, and maintains that FCA liability should attach to claims under *any* fraudulently induced contract. *See* Br. for the United States at 14-15. The United States further claims that there are at least two reasons why the Government might reject a low bid if it knew it was fraudulent. First, the Government has an interest in preserving the integrity of the bidding process. Second, a low bid carries the risk of the bidder's default if it wins the contract. *See id.* at 21-23.

We need not resolve this dispute. Because we conclude that, on the evidence in this case, no reasonable jury could find that Odebrecht fraudulently induced the Corps to enter into the contract, we do not address whether a fraud-in-the-inducement claim based on a fraudulent low bid can succeed absent proof that one or more requests for payment under the contract induced by the low bid were false in themselves.

## C. *Bettis's Evidence of Fraud*

On this appeal, Bettis claims that Odebrecht fraudulently induced the Corps to award it the contract in three ways: (1) by submitting a bid that did not conform with industry standards for accuracy; (2) by falsely reaffirming its bid despite its awareness of rising costs; and (3) by falsely claiming its intention to employ certain cost-saving devices during construction. We discuss each of these claims in turn.

### 1. *Odebrecht's Bid*

Bettis argues that Odebrecht's bid was fraudulent because Odebrecht failed to follow industry standards for accuracy in preparing its bid. Specifically, Bettis charges that Odebrecht inadequately performed "quantity take-offs" in calculating its cost estimates.

A quantity take-off is a detailed estimate of the quantity of each work item required by a contract. There is no dispute that performing quantity take-offs is a standard procedure in preparing bids. And Bettis produced evidence that a fully accurate and dependable cost estimate cannot be made in the absence of this procedure. Nevertheless, Bettis's argument fails. As the District Court recognized, *see Bettis*, 297 F. Supp. 2d at 286-87, even if Odebrecht failed to perform quantity take-offs, this would not establish that Odebrecht's bid was fraudulent, *i.e.*, that it contained false representations.

Bettis argues that Odebrecht's failure to perform quantity take-offs renders its bid fraudulent because "a bid proposal implicitly promises that the contractor is in possession of facts that support his estimate and that he knows of no contrary facts," citing *Harrison* for this proposition. Br. for Appellant at 36. While it may be true that "an opinion or estimate carries with it an implied assertion, not only that the speaker knows no facts which would preclude such an opinion, but that he does know facts which justify it," *Harrison*, 176 F.3d at 792 (internal quotation marks omitted), the point is inapposite. The disputed bid in this case did not purport to be an opinion or an estimate; rather, Odebrecht's bid was merely an offer to enter into a contract.

By submitting its bid, all that Odebrecht represented was that it would perform the work required at the unit prices specified in the bid in strict accordance with the terms of the solicitation. *See* Solicitation at 2, *reprinted in* J.A. at 1466, 1467. Bettis identifies no facts by which a reasonable jury could conclude that, when it submitted its bid, Odebrecht did not intend to be bound by the specified unit prices. Odebrecht did not, by submitting its bid, make *any* representations regarding its anticipated costs or the procedures it employed in calculating its bid. There are clearly no such express representations, and Bettis identifies no binding requirements – whether in the

federal acquisition regulations in Title 48 of the Code of Federal Regulations or elsewhere – that would give rise to any such representations by implication.

Therefore, on the evidence before us, no reasonable jury could conclude that, by submitting its bid, Odebrecht fraudulently induced the Corps to award it the contract.

### 2. *Odebrecht's Reaffirmation of the Bid*

As already noted, after the bids were opened in July 1993 and Odebrecht was ascertained as the low bidder, Tutor-Saliba commenced a series of protests to prevent Odebrecht from being awarded the contract. As a result of these protests, the awarding of the contract to Odebrecht was delayed until March 1994. During this protest period, the Corps requested Odebrecht to reaffirm its bid, which otherwise would have expired after 60 days.

Bettis claims that Odebrecht's reaffirmations were fraudulent because Odebrecht was aware that its costs were rising during the protest period. Bettis argues that, despite this knowledge that costs were rising, with each renewal Odebrecht "reaffirmed the costs and expenses, and underlying assumptions contained in the initial bid" and represented that "it was capable of performing the contract at the stated price." Br. for Appellant at 40, 18. Bettis also points out that Odebrecht's bid preparer testified that he did not amend the bid because it was his understanding that if the costs changed he could file a change order. Indeed, Bettis notes, Odebrecht ultimately did request an equitable adjustment of $7.9 million to cover escalation of costs attributable to the delay.

Bettis's argument here fails. Bettis continues to rely on his belief that the submission of the bid in this case amounted to a representation regarding Odebrecht's costs. It did not. As the District Court correctly discerned, "[b]y reaffirming its bid, [Odebrecht] agreed to continue to be bound by its bid and the

contract; it did not represent that its costs had not increased, and it did not promise that it would not seek equitable adjustments for increased costs irrespective of the justification for the increases." *Bettis*, 297 F. Supp. 2d at 289.

Moreover, Odebrecht's subsequent request for an equitable adjustment does not permit the inference that Odebrecht had no intention of being bound by its unit prices. As the District Court noted, subsequent mediation between Odebrecht and the Corps over the equitable adjustment demonstrated that Odebrecht's position had merit. *See id.* at 288-89. And in any event, we have previously noted that:

> Disputes arise between the government and its contractors every day. Contractors do not win every penny they claim. On [the relator's] theory, any contracting party that misunderstands its legal entitlements and therefore fails to recover on an invoice in full would be liable under the False Claims Act – except in instances where it was unaware of the facts that led to its failure to recover in full. This is not a prescription for fair or efficient contracting.

*United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1378 (D.C. Cir. 2000) (rejecting the argument that a contractor can be said to have knowingly presented false claims within the meaning of the Act by submitting invoices under a contract that was arguably voidable by the Government). This observation is apt here. Even if Odebrecht mistakenly assumed when it reaffirmed its bid that it could lawfully recover increased costs through a change order, this does not demonstrate fraud under the FCA.

3. *Odebrecht's Representations Regarding Cost-Saving Measures*

In July 1993, after the bids were opened and Odebrecht was identified as the low bidder, but before the contract was awarded, Odebrecht staff members met with Corps officials to

discuss Odebrecht's plans for the construction of the dam. At these meetings, Odebrecht announced certain cost-saving measures that it planned to use and which enabled it to make such a low bid. First, Odebrecht explained that it intended to purchase new equipment and operate it twenty hours per day, seven days a week, permitting Odebrecht to work with fewer pieces of equipment and to depreciate the equipment over the life of the contract. Second, Odebrecht detailed its plan to manage labor by using rolling construction teams that would work four consecutive days for ten hours per day (known as "rolling four-tens"), enabling construction to proceed for twenty hours per day, every day, without the payment of overtime. Third, Odebrecht proposed to excavate the spillway of the dam using a technique known as a "glory hole," which involves drilling a large hole down a mountain through which earth and rock is dropped from the top of the excavation area onto a conveyer system below.

Bettis argues that these representations were fraudulent, because Odebrecht "never used a glory hole . . . did not purchase substantially all new equipment . . . [and] did not, but for a brief period of time, deploy its work force in rolling 4-10's." Br. for Appellant at 38. Arguing that "the best indication of what a party intended to do is what he actually did," Bettis claims that these facts demonstrate that Odebrecht's representations were false. *Id.* at 39.

"Generally, there is no inference of fraudulent intent not to perform from the mere fact that a promise made is subsequently not performed." *United States ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 386 (5th Cir. 2003) (internal quotation marks omitted); *see also* RESTATEMENT (SECOND) OF TORTS § 530 cmt. d (1977) ("The intention of the promisor not to perform an enforceable or unenforceable agreement cannot be established solely by proof of its nonperformance, nor does his failure to perform the agreement throw upon him the burden of

showing that his nonperformance was due to reasons which operated after the agreement was entered into."); W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 109, at 764 (5th ed. 1984) ("The mere breach of a promise is never enough in itself to establish the fraudulent intent."). Bettis claims, however, that the inference of fraudulent intent is justified on the facts of this case, "when there is no intervening change of circumstances and where the repudiation comes quickly after the contract is signed." Br. for Appellant at 40. While Bettis is correct that fraudulent intent may sometimes be inferred in such circumstances, *see Willard*, 336 F.3d at 386; KEETON, *supra*, § 109, at 764-65, the record does not support such a characterization of the evidence.

As the District Court observed, the undisputed evidence is that Odebrecht substantially attempted to implement the proposed cost-saving measures. *See* 297 F. Supp. 2d at 283-86. Specifically, Odebrecht initially purchased mostly new equipment, used rolling four-tens throughout the first year of construction, and planned to use a glory hole until the spring or summer of 1995. In light of this undisputed evidence, the fact that some of these measures were ultimately abandoned as unfeasible does not permit the inference that Odebrecht never intended to implement them.

## III. CONCLUSION

Because there are no material facts in dispute and the undisputed facts do not permit the conclusion that Odebrecht fraudulently induced the Corps to award it the contract, we affirm the judgment of the District Court on this ground alone.

*So ordered.*