19-4331
*United States v. Strock*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2020

(Argued: September 24, 2020          Decided: December 3, 2020)

Docket No. 19-4331
_____

UNITED STATES OF AMERICA,

*Appellant*,

– v. –

LEE STROCK, CYNTHIA ANN GOLDE, STROCK CONTRACTING, INC.,

*Defendants-Appellees*,

KENNETH CARTER,

*Defendant.*
_____

B e f o r e:

CALABRESI, KATZMANN, and CARNEY, *Circuit Judges*.

_____

1

The United States of America appeals from an order of the United States District Court for the Western District of New York (Geraci, *C.J.*) dismissing its claims under the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq., and federal common law against defendants-appellees Lee Strock, Cynthia Golde, and Strock Contracting, Inc ("SCI"). In particular, the government challenges the district court's conclusion that the complaint failed to state a claim under the FCA because it did not adequately allege that the purported misrepresentations—that Strock's business qualified as a service-disabled veteran-owned small business ("SDVOSB")—were material to the government's decision to pay that business under contracts reserved for SDVOSBs. The government also challenges the district court's conclusion that the complaint failed to allege defendants-appellees' knowledge of materiality, as well as its dismissal of the common law claims.

We conclude that the district court's finding with respect to materiality was erroneous because it was premised on too restrictive a conception of the FCA materiality inquiry set out in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016). Further, we find that the district court's conclusion that the complaint failed to allege defendants-appellees' knowledge was erroneous as to Lee Strock, and potentially as to SCI, but not as to Cynthia Golde. Finally, we conclude that the district court should not have dismissed the common law claims on jurisdictional grounds because it had original jurisdiction over these claims under 28 U.S.C. § 1345. Accordingly, we AFFIRM in part, REVERSE in part, and VACATE in part the district court's dismissal of the complaint.

————————

CHARLES W. SCARBOROUGH, Appellate Staff Attorney, for Joseph H. Hunt, Assistant Attorney General, James P. Kennedy, United States Attorney for the Western District of New York, Buffalo, NY, *for Appellant*.

ROBERT C. SINGER, ESQ., Singer Legal PLLC, Williamsville, NY, *for Defendants-Appellees Lee Strock and Strock Contracting, Inc.*

REETUPARNA DUTTA, ESQ. (David A. Short, *on the brief*), Hodgson Russ LLP, Buffalo, NY *for Defendant-Appellee Cynthia Ann Golde.*

————————

KATZMANN, *Circuit Judge*:

This case calls upon us to address the materiality inquiry under the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq., in light of *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016).

Veteran Enterprises Company, Inc. ("VECO") was putatively owned by Terry Anderson, a service-disabled veteran. VECO applied for and received millions of dollars of federal government contracts that are reserved for small businesses owned by service-disabled veterans (known in this context as "service-disabled veteran-owned small businesses" or "SDVOSBs"). According to the government, however, Anderson's ownership was illusory, and he never controlled or managed VECO. In fact, the government alleges, the company was controlled by defendant-appellee Lee Strock, who set up VECO as a front to funnel contract work to his company, defendant-appellee Strock Contracting, Inc. ("Strock Contracting" or "SCI"). The government filed suit under the FCA and federal common law against Strock, SCI, and Cynthia Golde, an employee of both VECO and SCI.

The United States District Court for the Western District of New York (Geraci, *C.J.*) granted defendants' motion to dismiss the government's amended

complaint, concluding that the government had not adequately pleaded that the alleged misrepresentation—that VECO qualified as an SDVOSB—was material to the government's decision to make payments under the awarded contracts or that defendants knew of this materiality. Further, the district court dismissed the common law claims on jurisdictional grounds. Because we find that the district court's conclusion as to materiality relied on an unduly restrictive understanding of the FCA materiality analysis set out in *Escobar*, and that the complaint adequately alleges Strock's knowledge, we reverse in part. Additionally, we vacate the district court's dismissal insofar as it relied on these errors to dismiss the claims against SCI. Finally, we vacate the dismissal of the common law claims.

## BACKGROUND

Several statutory provisions authorize awarding government contracts to SDVOSBs. 15 U.S.C. § 657f(a) and (b) permit contracts to be awarded to SDVOSBs either on a sole-source basis or based on competition limited to SDVOSBs. 15 U.S.C. § 644(g)(1)(A)(ii) establishes a "[g]overnmentwide goal" that at least three percent of all contracts awarded during the fiscal year go to SDVOSBs. 38 U.S.C. § 8127 establishes a similar program specifically for contracts issued by the Department of Veterans Affairs ("VA").

As relevant to this appeal, a SDVOSB must be majority-owned by, and its management and daily operations must be controlled by, one or more service-disabled veterans. 15 U.S.C. § 632(q)(2)(A); 38 U.S.C. § 8127(k)(3).[1] To be "controlled" by a service-disabled veteran "means that both the long-term decision[] making and the day-to-day management and administration of the business operations must be conducted by one or more service-disabled veterans." 13 C.F.R. § 125.13(a).

"At the time that a service-disabled veteran-owned small business concern submits its offer" to perform government contracting work, "it must represent to the contracting officer that it is a [SDVOSB]." 48 C.F.R. § 19.1403(b). Where contracts "have been set aside for" SDVOSBs, "[o]ffers received from concerns that are not [SDVOSBs] shall not be considered," and "[a]ny award resulting from this solicitation will be made to a[n] [SDVOSB]." 48 C.F.R § 52.219-27(b)(1), (c)(1)–(2); *see also* 48 C.F.R. § 852.219-10(b)(1)–(2).

---

[1] Prior to 2016, and throughout the time period during which the contracts at issue in this case were awarded, section 8127 had its own definition of SDVOSB instead of incorporating section 632's. *See* 38 U.S.C. § 8127(*l*) (2016). The definitions, however, are indistinguishable for purposes of this appeal.

Defendant Lee Strock is the owner of defendant Strock Contracting.[2] In 2006, Strock met defendant Terry Anderson, a service-disabled veteran. The two formed Veteran Enterprises Company, Inc. ("VECO"), with Anderson as president and 51% owner, Strock as vice-president and 30% owner, and Ken Carter as secretary and 19% owner.[3] VECO subsequently applied for and received SDVOSB recognition from the VA. Between 2008 and 2013, VECO was awarded over $21 million in SDVOSB-reserved contracts from the VA, the Army, and the Air Force.

According to the government, however, VECO's SDVOSB status was a sham. After another company owned by Strock lost its eligibility for a Small Business Administration contracting program, Strock "decided to recruit a service-disabled veteran," Anderson, "to head a company in order that Lee Strock and Strock Contracting could earn profits on federal contracts from the VA and other federal agencies that were set aside for SDVOSBs." Joint App'x 21 ¶ 30. But Anderson's leadership of VECO existed only on paper. Strock, not Anderson, controlled the day-to-day operations at VECO. Strock decided which contracts

---

[2] As this appeal is from a motion to dismiss, all facts are drawn from the government's Amended Complaint, which is the operative pleading.

[3] Mr. Carter was initially named as a defendant, but he was dismissed from this appeal after he passed away. *See* No. 19-4331, Dkt. No. 30.

VECO would bid on; Anderson was not involved. Anderson was not given access to payroll records. He made no decisions about hiring or firing. He would "occasionally" attend meetings and perform inspections, but he did little else. *Id.* at 25–26 ¶¶ 63–64. Strock owned the building that VECO "leased" as office space, and Anderson did not even have a key to the office; defendant Cynthia Golde (or another employee) had to let him in. Nor did Anderson have access to the company email account, which nonetheless displayed his name as the sender. Although he was nominally the president, he was not the highest-paid employee; and although he was purportedly the majority shareholder, he was paid less than 5% of VECO's profits. VECO also made several "questionable" payments to Strock Contracting, totaling several hundred thousand dollars. *Id.* at 31 ¶ 102. The government claims that, had it known that VECO was not a bona fide SDVOSB, it would either not have awarded the contracts or would have terminated them.

The government filed suit, asserting violations of the False Claims Act, as well as common law fraud, unjust enrichment, and payment by mistake. The district court granted the defendants' motion to dismiss. The court concluded that the government had not pleaded with the particularity required by Federal Rule of Civil Procedure 9(b) that any of the individual defendants knew that VECO did

not qualify as an SDVOSB, or knew that such a designation would be material to the government's decision to pay VECO. The district court further held that the complaint did not adequately plead that any misrepresentation was material for FCA purposes, reasoning that "a misrepresentation is not necessarily material to the Government's *payment decision* just because the Government would not have awarded the contract but for the misrepresentation." *Id.* at 74.[4] The district court then "decline[d] to exercise jurisdiction over the Government's common law claims." *Id.* at 75. This appeal followed.

## DISCUSSION

### I.    Standard of Review

"We review the district court's grant of defendants' Rule 12(b)(6) motion to dismiss *de novo*, accepting all factual claims in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." *United States v. Wells Fargo & Co.*, 943 F.3d 588, 594 (2d Cir. 2019).[5]

---

[4] The district court also held that the complaint did not adequately plead a conspiracy under the False Claims Act. The government does not challenge this aspect of the court's ruling on appeal.

[5] Unless otherwise indicated, case quotations omit all internal quotation marks, citations, footnotes, and alterations.

## II.     The False Claims Act Counts

### A.     Legal Standard

The False Claims Act imposes liability, as relevant here, on a person who either "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)–(B). "Knowingly" means that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1)(A). It "require[s] no proof of specific intent to defraud." *Id.* § 3729(b)(1)(B). "Material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4). The government must "plead [its] claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b) by, for instance, pleading facts to support allegations of materiality." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2004 n.6 (2016).

### B.     Materiality

We turn first to whether the government sufficiently alleges that defendants' misrepresentations about VECO's SDVOSB status were material. To

9

be actionable under the FCA, "[a] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision." *Id.* at 1996. The Supreme Court recently clarified this materiality requirement in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016). In *Escobar*, the Court explained that the FCA's "materiality standard is demanding," *id.* at 2003, and "looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation," *id.* at 2002, rather than superficial designations. Thus, a misrepresentation is not necessarily material because "the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* at 2003. Nor is "the Government's decision to expressly identify a provision as a condition of payment . . . automatically dispositive," although it is "relevant." *Id.* Rather, determining materiality requires an inquiry into at least the following factors:

> [P]roof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated,

10

and has signaled no change in position, that is strong evidence that the requirements are not material.

*Id.* at 2003–04; *see also Bishop v. Wells Fargo & Co.*, 870 F.3d 104, 107 (2d Cir. 2017) (per curiam). In addition, we inquire into whether or not the "noncompliance is minor or insubstantial." *Escobar*, 136 S. Ct. at 2003.

Each party argues that *Escobar* requires resolving the question of whether defendants' alleged misrepresentations were "material to the Government's payment decision" in its favor. *Escobar*, 136 S. Ct. at 1996. Central to this dispute is not, however, any disagreement over *Escobar*'s definition of the term "material," but instead its definition of the term "payment decision." *Id.* at 1996. Underlying the government's argument is its assumption that the primarily relevant "payment decision" was the government's decision to award VECO contracts in the first instance. Underlying defendants' claim is the assumption that the only relevant "payment decision" is the government's decision to ultimately pay claims under these contracts.

Because resolving this dispute over the meaning of "payment decision" is thus essential to our materiality analysis in this case, we address this question first. Guided by *Escobar*, and for the reasons that follow, we assign "payment decision" a broader scope than either party would. In this case, the government's "payment

11

decision" comprised both the decision to award contracts in the first instance and the decision to ultimately pay claims under these contracts.

The government's argument that materiality must be assessed primarily with regard to the government's decision to award contracts to VECO is premised on the fact that its legal theory is one of "fraudulent inducement." Under this fraudulent inducement theory, FCA liability attaches not because a defendant has submitted any claim for payment that is "literally false," but instead because "the contract under which payment [is] made is procured by fraud." *United States ex rel. Longhi v. United States*, 575 F.3d 458, 467–68 (5th Cir. 2009); *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 543–45 (1943) (finding that contractors who secured contracts through collusive bidding were liable for claims arising under those contracts under the FCA), *abrogated in part by statute on other grounds*.[6] The theory

---

[6] *See also, e.g., United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 787–88 (4th Cir. 1999). We implicitly approved the fraudulent inducement theory in *United States ex rel. Feldman v. van Gorp*, 697 F.3d 78, 91 (2d Cir. 2012) ("If the government made payment based on a false statement, then that is enough for liability in an FCA case, regardless of whether that false statement comes at the beginning of a contractual relationship or later."). We did so even before *Feldman*, in *United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 114–15 (2d Cir. 2010), *rev'd on other grounds*, 563 U.S. 401 (2011), when we held that the relator had stated an FCA claim by alleging that the defendant submitted false certifications with bids and thereby won a government contract.

is based on the notion that "fraud d[oes] not spend itself with the execution of the contract," but instead "taint[s]" every claim subsequently brought under the contract, rendering these claims actionably false. *Hess*, 317 U.S. at 543; *see also Longhi*, 575 F.3d at 468. The government argues that because the falsity of the claims in a fraudulent inducement case is imported from the falsity of statements made to obtain the contract in the first instance, "the appropriate focus . . . is on the likely effect of the defendant's fraud on the government's actions *at the time it awarded the contract*, not when the government subsequently paid claims." Appellant's Br. 21. In other words, on the government's view, the primarily relevant "payment decision" is the decision to award the contract, not the decision to ultimately pay a claim under the contract.

*Escobar*, however, precludes understanding the relevant "payment decision" in this case as so narrowly focused on the government's decision to award contracts. In rejecting the view that a contractual, statutory, or regulatory provision is material only where it is "expressly designated a condition of payment," 136 S. Ct. at 2001, and similarly rejecting the view that a provision is necessarily material where "the Government would be entitled to refuse payment were it aware of the violation," *id.* at 2004, *Escobar* eschews a materiality analysis

13

that prioritizes the government's claims about how it would treat a requirement over how the government actually treats a requirement upon discovering a violation. Specifically, *Escobar* identifies as the primary example of such actual treatment the government's reaction to noncompliance when a claim for ultimate payment is made—whether it be "refus[al] to pay claims in the mine run of cases," "pay[ment of] a particular claim" despite the government's actual knowledge that conditions of payment have been violated, or "regular[] pay[ment of] a particular type of claim" despite the government's knowledge of program violations. *Id.* at 2003. Accordingly, the government's conduct after claims arise under a contract, not merely at the time of contract award, is highly relevant to *Escobar*'s materiality analysis. The government's position is thus unpersuasive.

The defendants' suggestion that the relevant "payment decision" excludes the government's initial decision to award a contract, however, is no better. As noted above, this approach makes little sense in a fraudulent inducement case, where a defendant's alleged misrepresentations at the time the government awarded the contract are what render any subsequent claim under that contract fraudulent at all. This theory of fraud recognizes that the government's decision to enter a contract in some sense undergirds any decision to ultimately pay claims

14

arising under the contract. *See Hess*, 317 U.S. at 543 (finding contractors' misrepresentation that they satisfied a non-collusive bidding requirement material because "[t]he government's money would never have been placed in the joint fund for payment to respondents had its agents known the bids were collusive"). As a result, other circuits addressing FCA fraudulent inducement claims have assessed materiality at least partly with regard to the government's decision to enter a relationship with a defendant in the first instance. *See, e.g.*, *United States v. Luce*, 873 F.3d 999, 1008-09 (7th Cir. 2017) (considering as part of its materiality analysis that a defendant's misrepresentation concerned a "threshold eligibility requirement that, by extension, was tied to *every*" claim); *United States ex rel. Miller v. Weston Educ., Inc.*, 840 F.3d 494, 504 (8th Cir. 2016) (focusing materiality analysis on whether a misrepresentation "influenced the government's decision to enter into its relationship with" the defendant).

More importantly, *Escobar* itself supports understanding the government's "payment decision" to include the government's initial decision to enter a contract in fraudulent inducement cases. *Escobar* rejected the notion that FCA liability is limited to instances in which a defendant violates an express condition of payment in part because such a rule would "undercut[]" the FCA by imposing no liability

15

for "misrepresenting compliance with a condition of eligibility to even participate in a federal program when submitting a claim." 136 S. Ct. at 2002. This language strongly suggests that FCA liability attaches where a defendant's misrepresentations impact government decisions about eligibility, and by extension, that FCA materiality analysis can encompass a misrepresentation's impact on the government's decision to do business with a defendant in the first instance. This conclusion in no way contradicts *Escobar*'s focus at other points on the government's ultimate payment decision; *Escobar* taught that "materiality cannot rest on a single fact or occurrence as always determinative" such that consideration of both points of decision is entirely appropriate. *Id.* at 2001; *see also id.* at 2003 (explaining that "proof of materiality can include, but is not necessarily limited to," the factors explicitly listed in *Escobar*). Accordingly, we reject the defendants' suggestion that the "payment decision" relevant to our materiality analysis does not include the government's decision to award VECO contracts in the first instance.

In sum, we find that, at least in fraudulent inducement cases, the government's "payment decision" under *Escobar* encompasses both its decision to award a contract and its ultimate decision to pay under that contract. We thus

16

assess whether the complaint sufficiently pleads materiality under the *Escobar* factors with a view to both aspects of the government's decision.

### 1. Whether the Requirement Was an Express Condition of Payment

The first factor that *Escobar* identifies as relevant to materiality is whether the government "expressly identif[ied] a provision as a condition of payment." *Id.* at 2003. The district court concluded that this factor weighed against a finding of materiality here because the government "d[id] not allege that it expressly conditioned payment to VECO on VECO's compliance with SDVOSB contracting requirements." Joint App'x 69**.** While the district court was correct—as the government concedes—that SDVOSB compliance was not an express condition of ultimate payment under any government contract with the defendants, the district court erred by concluding that this fact was dispositive with regard to this first factor.

Because, as explained above, materiality must also be assessed with regard to the government's decision to award contracts to VECO in the first instance, the analysis of the first *Escobar* factor must also include the complaint's allegations that the government expressly named SDVOSB compliance as a condition of any contract award. Indeed, *Escobar* faults a theory of materiality that places too much

17

emphasis on whether a provision is an express condition of ultimate payment in part because such emphasis would preclude a finding of materiality in cases where a defendant "misrepresent[ed] compliance with a condition of eligibility to even participate in a federal program." 136 S. Ct. at 2002. In other words, where a misrepresentation relates to a condition of eligibility, examining only the express conditions of ultimate payment will obscure the true materiality of a requirement. Because the government alleges that it expressly designated SDVOSB compliance a condition of contract eligibility, we thus find that this factor weighs in favor of a finding of materiality.

### 2. The Government's Response to Similar Misrepresentations

The next factor concerns the government's response to noncompliance with the relevant contractual, statutory, or regulatory provision. *Escobar* directs examination of the government's reaction to noncompliance both "in the mine run of cases," as well as in the "particular" case at issue. *Id.* at 2003. We turn first to the adequacy of the complaint's allegations regarding the government's response to noncompliance after it has already awarded a contract ("post-award" conduct), and then turn to examine the government's response to noncompliance before it has awarded a contract ("pre-award" conduct).

18

While we agree with the district court's ultimate conclusion that the complaint's allegations about the government's post-award conduct do not strongly support a finding of materiality, our reasoning differs from that of the district court. The complaint's primary allegation about the government's generalized post-award conduct consists of its claim, based on a number of Office of Inspector General reports, that "the Government has regularly prosecuted . . . parties that fraudulently obtain SDVOSB set-aside contracts." Joint App'x 46 ¶ 150. The district court discounted these allegations because defendants "cite evidence"—specifically, a 2009 Government Accountability Office ("GAO") report—suggesting that enforcement is sporadic, and because the examples of enforcement the government identified were "not all . . . FCA cases." *Id.* at 69. Neither reason is persuasive.

First, the district court's reliance on the GAO report to reach its conclusion was inappropriate. In considering a motion to dismiss for failure to state a claim, "the district court is normally required to look only to the allegations on the face of the complaint." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). While the court may consider documents that "are attached to the complaint," "incorporated in it by reference," "integral" to the complaint, or the proper subject of judicial notice,

*id.*, none of these exceptions justifies the district court's reliance on the GAO report here. First, the GAO report was neither attached to the complaint nor incorporated by reference. Second, the GAO report was not "integral" to the complaint. As defendants acknowledge, a document is "integral" when the complaint "relies heavily upon [the document's] terms and effect." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). Here, the complaint does not rely on the GAO report at all, so it is not "integral." Third, while the district court could have taken judicial notice of the GAO report, it should only have "do[ne] so in order to determine *what* statements [it] contained . . . *not for the truth of the matters asserted*" therein. *Roth*, 489 F.3d at 509. The district court's consideration of the GAO Report as evidence of the government's spotty post-award enforcement record was thus inappropriate in ruling on the motion to dismiss.

The district court's second justification for discounting the government's allegations that it "has regularly prosecuted, both criminally and civilly, parties that fraudulently obtain SDVOSB set-aside contracts," Joint App'x 46 ¶ 150, is unpersuasive for a different reason. The district court suggested that this allegation was not probative of materiality because "not all of" the cases the government cited in support of it "appear to be FCA cases." *Id.* at 69. The district

court, however, provided no basis for the proposition that post hoc enforcement efforts, to the extent they are probative of materiality at all, must be from the FCA context. More importantly, the district court's focus on what kinds of post hoc enforcement actions are relevant to materiality obscures the more fundamental question of whether post hoc enforcement actions are relevant to FCA materiality analysis at all. This question was not directly addressed by *Escobar*, which focused on whether the government "consistently refuses to pay claims," not whether the government later pursues damages or criminal prosecution. 136 S. Ct. at 2003.

Nonetheless, *Escobar* indirectly indicates that allegations of post hoc prosecutions or other enforcement actions do not carry the same probative weight as allegations of nonpayment. *Escobar* emphasized that "[t]he materiality standard is demanding," and that the government may not manufacture materiality by alleging it had an option not to pay after the fact. *Id.* Allowing the government to rely on post hoc enforcement efforts to satisfy the materiality requirement would allow the government to engage in just such materiality manufacturing, and at relatively low cost. Unlike mid-contract refusals to pay, engaging in post hoc enforcement does not require the government to risk delay of a project. Instead, the government needs risk only the cost of litigation, a risk that is mitigated by an

opportunity to recoup the cost of a completed project. Thus, while purely post hoc enforcement actions can carry some weight in a materiality analysis, they are less probative than allegations that the government actually refuses to make payments once it determines that the SDVOSB condition has been violated. The government's allegations that it prosecutes those who fraudulently obtain SDVOSB set-aside contracts thus are at best only neutral with regard to a finding of materiality, particularly in light of the complaint's failure to allege even a single instance in which the government actually refused to pay a claim or terminated an existing contract based on a false SDVOSB representation.

The complaint's allegations about the post-award actions the government took in response to the defendants' particular instances of alleged noncompliance are no more indicative of materiality. Significantly, the complaint makes no allegation that the government refused to pay VECO, suspended its contracts, or debarred it from bidding on future contracts. Instead, the complaint alleges that the contracting officers *might* have taken steps to cease payments, terminate the contracts, or both had they learned that VECO was not a bona fide SDVOSB. Some of these allegations amount to no more than the suggestion "that the Government would have the option to decline to pay if it knew of the defendant's

22

noncompliance," and are thus not "sufficient for a finding of materiality." *Escobar*, 136 S. Ct. at 2003. While other allegations are less conditional and allege what the government "would have" done had it learned of the noncompliance, such inherently self-serving and unverifiable claims alone cannot be sufficient to demonstrate materiality. Thus, the complaint's allegations about the government's post-award behavior provide only weak support for a finding of materiality.

The government's allegations about its pre-award response to noncompliance, however, add some support to its allegations of materiality. Although the government does not specifically allege that it does not award contracts to entities it knows not to be SDVOSBs, the complaint as a whole supports such an inference. *See Wells Fargo & Co.*, 943 F.3d at 594 (noting that we must "draw[] all reasonable inferences in the plaintiff's favor"). The complaint outlines the numerous steps the government takes to ensure an applicant is an SDVOSB before awarding a contract and it identifies multiple contracting officers or specialists who allegedly would not have awarded contracts to VECO had they been aware it was not an SDVOSB. Taken together, these allegations lead to a reasonable inference that, in general, the government does not award contracts to companies that it knows not to have complied with SDVOSB requirements. This

suggests that defendants' misrepresentations were material to the government's decision to enter the contract in the first instance.

Given the government's allegations that it was not aware of VECO's noncompliance, analyzing the government's response to known noncompliance in this particular case is not particularly enlightening. Strock nonetheless contends that this analysis weighs against materiality because there is evidence that the government awarded VECO contracts despite actual knowledge that VECO was not in compliance with program requirements. The only record citation Strock offers in support of this contention, however, is a claim made upon information and belief in an attorney affidavit that the defendants filed in support of the motion to dismiss. We once again decline Strock's invitation to consider a document that is not attached to, incorporated by, or integral to the complaint, and find that this factor has no bearing on the materiality analysis at the motion to dismiss stage of the proceedings.

In sum, the government's alleged post-award conduct in response to noncompliance provides at most weak support for materiality with regard to the government's decision to ultimately pay under the relevant contracts. The government's pre-award conduct, however, better supports materiality with

regard to the government's decision to award the relevant contracts. Given both decisions are part of the government's "payment decision," these considerations taken together indicate that this factor supports materiality, if weakly.

### 3. Whether Noncompliance Was Minor or Insubstantial

Finally, we examine whether the defendants' alleged noncompliance was substantial. *Escobar*, 136 S. Ct. at 2003. The district court held that this factor weighed against materiality because the complaint failed to allege that noncompliance with the SDVOSB condition was substantial as to the government's "payment decision," even though it might have been substantial with respect to the government's decision to award the contract. As previously established, however, this reasoning relies on an unduly narrow understanding of the scope of the relevant "payment decision." The complaint plausibly alleges that defendants' SDVOSB-status violation was substantial, whether viewed in light of the government's decision to award the relevant contracts or ultimately pay out under those contracts.

The government alleges that performance by an SDVOSB is at the very heart of the SDVOSB statutory and regulatory regime: "increas[ing] contracting opportunities for small business concerns owned and controlled by . . . veterans with service connected disabilities." Joint App'x 17 ¶ 17 (quoting 38 U.S.C. §

25

8127(a)(1)). Further it alleges that defendants, by misrepresenting their SDVOSB status, "undercut th[is] express congressional purpose" "[b]y diverting contracts and benefits . . . intended for service-disabled veterans towards an ineligible company." *Id.* at 13 ¶ 3. These allegations, accepted as true, indicate that VECO's noncompliance was substantial from the very inception of its contracts with the government through their completion.

The defendants' attempt to minimize their alleged noncompliance by recasting the relevant contracts as aimed at the construction of government buildings alone is unpersuasive. First, the defendants' characterizations cannot, at the motion to dismiss stage, displace the government's well-pleaded allegations about the contracts' purpose or the allegations that the defendants' noncompliance deprived the government of "the intended benefits of a SDVOSB receiving and performing federal contracts." *Id.* Second, the complaint's characterizations of the contracts' purpose are eminently plausible in light of Congress's own statements about the purpose of the SDVOSB statutory and regulatory regime. *See* 38 U.S.C. § 8127(a)(1). The substantiality factor thus weighs strongly in favor of materiality.

In sum, we find that two factors—the express nature of the eligibility condition and the substantiality of the defendants' alleged noncompliance—weigh

26

firmly in favor of materiality, while the third—the government's response to noncompliance in this and other cases—only weakly supports materiality. This is enough to find that the government has plausibly alleged materiality.

## C.    Knowledge

To find FCA liability, it is not enough for the defendants to have presented a materially false claim; they must have done so "knowingly," *see* 31 U.S.C. § 3729(a)(1)(A)–(B), meaning with "actual knowledge of the information, "in deliberate ignorance of the truth or falsity of the information," or "in reckless disregard of the truth or falsity of the information" *Id.* § 3729(b)(1)(A). In other words, the government must allege that the defendants "knowingly violated a requirement that the defendant[s] know[] is material to the Government's payment decision." *Escobar*, 136 S. Ct. at 1996.

Claims under the FCA are subject to the particularity requirement of Federal Rule of Civil Procedure 9(b). *Id.* at 2004 n.6.[7] "Rule 9(b) permits knowledge to be averred generally," but plaintiffs, including the government, still must "plead the

---

[7] Strock argues that the complaint's general failure to comply with Rule 9(b) offers an independent ground for dismissal. But none of the purported deficiencies cited by Strock was sufficient to deprive him of the requisite "fair notice" of the government's claim, and they thus do not warrant dismissal. *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 86 (2d Cir. 2017).

factual basis which gives rise to a strong inference of fraudulent intent." *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991). "The requisite strong inference of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006). The complaint must plead facts supporting scienter as to each defendant. *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009). We address each defendant in turn.

1. Lee Strock

The district court acknowledged that the complaint alleges that Strock "decided to establish an SDVOSB to obtain set-aside contracts," "recruited Anderson as the 'figurehead' president," and "direct[ed]" VECO employees to submit false certifications and false claims. Joint App'x 64–65. And the court further acknowledged that facts alleged by the government "could support an inference that Strock knew that VECO did not qualify as an SDVOSB, such as that Strock gave Anderson a 51% share in VECO (the minimum required for veteran ownership), set up email addresses in Anderson's name to be managed by other employees, and established VECO for his and Strock Contracting's profit." *Id.* at

28

65. But the court concluded that the complaint nevertheless failed to adequately allege that Strock knew that VECO's SDVOSB status was material to the government.

We respectfully disagree. At a minimum, the complaint adequately alleges that Strock acted in reckless disregard of whether the SDVOSB-status requirement was material. First, the complaint alleges "strong circumstantial evidence of . . . recklessness" as to materiality. *Lerner*, 459 F.3d at 291. The complaint alleges that all the contract solicitations at issue prominently advised that only bids from SDVOSBs would be considered and that firms wishing to bid on such contracts must certify their SDVOSB status. Moreover, the complaint alleges that Strock undertook elaborate steps to make it appear that VECO was in fact in compliance with SDVOSB requirements, such as recruiting Terry Anderson, giving Anderson the minimum share required for veteran ownership, and setting up email addresses in Anderson's name to be managed by other employees. This is strong circumstantial evidence that Strock acted in reckless disregard of whether VECO's SDVOSB status was material to the government's decision to both award and pay out under SDVOSB contracts.

Moreover, the complaint adequately alleges that Strock had "motive and opportunity to commit fraud." *Lerner*, 459 F.3d at 290. As to motive, the complaint alleges that Strock set up VECO as an SDVOSB to replace the federal contracting opportunities he lost after Strock Contracting graduated out of the Small Business Administration contracting program. As to opportunity, the government alleges that Strock owned the building that VECO "leased" as office space and VECO made several "questionable" payments to Strock Contracting, totaling several hundred thousand dollars. In other words, Strock stood to benefit directly from VECO's success, and had the wherewithal to do so. Thus, the government has plausibly alleged at least that Strock acted in reckless disregard of the materiality of the SDVOSB compliance. The government has therefore met its burden with regard to Strock's knowledge.

### 2. Cynthia Golde

We agree with the district court, however, that the complaint does not sufficiently allege that Golde individually knew that VECO did not qualify as an SDVOSB. Some of the allegations against Golde are not indicative of such knowledge because they do not specify whether Golde was actually involved. Other allegations relate to behavior too mundane to support an inference of knowing falsity.

Further, while the complaint alleges that Golde presented bids for SDVOSB set-aside contracts and made requests for payment under such contracts, the complaint does not specify which bids were made by Golde or which representations were contained in those bids. We thus cannot infer from these allegations that Golde knowingly submitted false bids. This point is illustrated by the only invoice that the complaint specifically alleges that Golde submitted. That invoice appears to have simply included a certification that "the contract was performed in accordance with the specifications, terms and conditions of the contract." Joint App'x 34 ¶ 113. Such a boilerplate certification, which may not have even mentioned the SDVOSB requirement, is not likely to have alerted Golde to any noncompliance. Without any allegations about whether other documents submitted by Golde contained more explicit misrepresentations, the complaint's general allegations that Golde submitted bids or requests for payment are insufficient to allege knowledge.

A few of the allegations against Golde are slightly more suggestive of knowledge. For example, Golde was allegedly employed simultaneously by VECO and Strock Enterprises (a company related to SCI and VECO), and she discussed moving employees between the two. This could be taken as evidence

31

that Golde was aware that VECO was just a front aimed to provide Strock access to SDVOSB contracts. But absent more specific allegations of what Golde knew of Strock's plans, this is too speculative to support a claim for fraud under Rule 9(b). Similarly, the allegation that Golde "knew that Lee Strock controlled the day-to-day and long-term business operations of VECO," Joint App'x 28 ¶ 82, might support the inference that Golde knew VECO was not a bona fide SDVOSB. That inference, however, relies on the assumption—not supported elsewhere in the complaint—that Golde knew that SDVOSB certification requires that the veteran not only own but also control the business in question.

Absent more information about which bids Golde submitted, or the content of those bids, the complaint does not adequately plead knowledge as to Golde with the particularity required under Rule 9(b). And, unlike Strock, none of the allegations establish either "motive and opportunity to commit fraud" or "strong circumstantial evidence of conscious misbehavior or recklessness." *Lerner*, 459 F.3d at 290–91. We therefore affirm the district court's dismissal of the claims against Golde.

### D. Remaining Claims

In addition to the FCA claims against Strock and Golde, the district court also dismissed the complaint's FCA claim against Strock Contracting as well as its

common law claims against all defendants. The district court's reasons for doing so were erroneous. First, the district court dismissed the FCA claim against Strock Contracting, which was based on a theory of vicarious liability, because it found that the complaint did not state a claim against the individual defendants. As explained, however, the complaint adequately states a claim against Strock.[8]

Second, the district court dismissed the government's common law claims on the ground that it could decline to exercise supplemental jurisdiction over them. However, as the government argues, and as the defendants apparently concede, the district court had original jurisdiction over these claims under 28 U.S.C. § 1345 ("[T]he district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States . . . .").

The defendants urge that there are nonetheless alternative grounds upon which to affirm the district court's judgment as to these claims. However, "this Court generally will not review an issue the district court did not decide," *Macey v. Carolina Cas. Ins. Co.*, 674 F.3d 125, 131 (2d Cir. 2012), and we find that there is no reason to do so here. Accordingly, we vacate the district court's dismissal of these claims and leave it to the district court on remand to determine in the first

---

[8] We express no view about the potential merit of a theory of vicarious liability, which is not a theory that has yet been adopted in our circuit.

33

instance whether dismissal is appropriate on any of the defendants' proposed alternative grounds.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's dismissal of the FCA counts against Golde and **REVERSE** the dismissal of the FCA counts against Strock. Further, we **VACATE** the dismissal of the FCA counts against Strock Contracting, Inc. and the federal common law claims against all defendants. We **REMAND** the case for the district court to consider the adequacy of the latter claims in the first instance and to conduct additional proceedings consistent with this opinion.